TAX ANALYSTS AND ADVOCATES, and Thomas F. Field, Plaintiffs,

v.

William E. SIMON, Secretary of the Treasury of the United States, and Donald C. Alexander, Commissioner of Internal Revenue, Defendants.

Civ. A. No. 74–917.

United States District Court, District of Columbia.

Feb. 5, 1975.

Ira L. Tannenbaum, Thomas F. Field, Samuel H. Black, Washington, D. C., for plaintiffs.

John J. McCarthy, Donald J. Gavin, John M. Cunningham, Tax Div., Dept. of Justice, Washington, D.C., for defendants.

## OPINION

HART, Chief Judge.

This case comes before the Court on Defendants' Motion to Dismiss the Complaint and Opposition thereto. Plaintiffs filed their original complaint on June 17, 1974 and their amended complaint on August 13, 1974. The amendment was generated by one plaintiff's acquisition of the entire working in-

terest in a domestic oil well. Both complaints seek a declaratory judgment that published and private rulings of the Internal Revenue Service allowing tax credits for payments made to foreign countries in connection with oil extraction and production and which are calculated on a fixed per barrel basis are unlawful since they are contrary to the Internal Revenue Code, 26 U.S.C. §§ 901(b), 903. Plaintiffs also seek in both complaints a permanent injunction requiring the Internal Revenue Service to withdraw these Rulings; restraining the IRS from permitting income tax credits for payments made to foreign countries in connection with oil extraction and production which are calculated on a fixed per barrel basis and requiring Defendants to assess and collect taxes from oil companies for all periods not barred by the statute of limitations in those cases where foreign tax credits were taken pursuant to these Rulings. Jurisdiction is alleged under 28 U.S.C. §§ 1340, 2201, 2202 and 5 U.S.C. §§ 702, 703.

### FACTS

Plaintiff Tax Analysts and Advocates (TAA) is a non-profit corporation organized under the laws of the District of Columbia in 1970 for the purpose of promoting tax reform through educating the public in federal tax matters and conducting a public interest legal practice concerned with federal tax matters. TAA represents over one hundred seventy-five individual supporters, each of whom has contributed financially to TAA so that they could obtain legal representation to ensure that the Internal Revenue Service properly applies the Internal Revenue Code and does not grant special interest groups favorable treatment beyond that which the IRS can lawfully provide. The complaint alleges that each of these individuals, as a United States taxpayer, has a personal pecuniary interest in requiring that the IRS assess and collect taxes owed by other taxpayers to the fullest possible extent under the Internal Revenue Code.

Plaintiff Thomas F. Field is the Executive Director of TAA. In the original complaint, Field asserts that he is an American citizen and federal taxpayer who has a personal pecuniary interest in requiring that the IRS assess and collect taxes owed by other taxpayers to the fullest possible extent under the provisions of the IRC. In the interim between the filing of the original complaint and the filing of the amended complaint, Plaintiff Field purchased the entire working interest in a currently producing oil well in Pennsylvania. Thus the amended complaint asserts an additional basis for this suit, namely that Plaintiff Field has a personal pecuniary interest in seeing that other persons also producing oil do not receive unjustifiably preferential tax treatment with respect to their oil production income which would permit them to sell their oil at a lower price than would be possible without the preferential treatment, thus adversely affecting Field's income from his oil production.

Field's oil well currently produces three barrels of crude oil per month and future production is anticipated at that level. The most recent price of that oil is $10.28 per barrel and future prices are expected to remain at this level. Projected operating costs for the oil well are $120 per year. Gross receipts from the sale of the well's production are estimated to be $370.08 per year for the next five years. Pursuant to the purchase agreement of August 13, 1974, the owners of the land on which the well is located (Hickman Lumber Company) and the operator of the well (David H. Melot) together will receive a royalty of one-eighth of the proceeds of all oil produced from the well. These royalty payments are expected to amount to $46.32 per year for the next five years. Field's anticipated net profits before taxes are approximately $203.76 per year for the next five years. The term "entire working interest" in the oil well means that Mr. Field will own all the rights to operate the well and that he will receive the entire amount of the proceeds derived

from the sale of the well's production reduced only by the royalty he must pay to the owners of the land (Hickman Lumber Company) and the operator of the well (David H. Melot). During the period commencing with his purchase of the working interest in the well on August 13, 1974 and terminating on October 31, 1974, Field earned $42.47, which constitutes the total proceeds from the sale of all oil produced between August 13 and October 31, 1974, reduced by the one-eighth royalty and the operating costs.

Defendant William E. Simon is Secretary of the Treasury of the United States. Defendant Donald C. Alexander is Commissioner of Internal Revenue. Under 26 U.S.C. §§ 7801, 7802, the Internal Revenue Code charges these Defendants with the responsibility to administer and enforce the Code, including the provisions concerning the foreign tax credit, 26 U.S.C. §§ 901(b), 903.

The relevant provisions of the Internal Revenue Code are sections 901(b) and 903, 26 U.S.C. §§ 901(b), 903 (1954). Section 901(b) allows qualified citizens of the United States and domestic corporations to claim a tax credit for "the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country . . . ." Section 903 states that "the term 'income, war profits, and excess profits taxes' shall include a tax paid in lieu of a tax on income, war profits, or excess profits otherwise generally imposed by any foreign country . . . ."

The published Revenue Rulings at issue here were published in 1955 and 1968. Rev.Rul. 55–296, 1955–1 Cum. Bull. 386, allowed a foreign tax credit for income taxes paid to Saudi Arabia by virtue of Saudi Arabian Royal Decrees of November 4 and December 27, 1950. Rev.Rule 68–552, 1968–2 Cum. Bull. 306, allowed a foreign tax credit for income taxes imposed by Article 14 (1)(a) of Libyan Petroleum Law No. 25 of 1955, as amended through November 20, 1965. The private unpublished rulings at issue were promulgated by the Internal Revenue Service to allow foreign tax credits under section 901(b) for income taxes imposed by Iran, Kuwait and Venezuela in connection with oil production in those countries.

## PLAINTIFFS' ARGUMENTS

Plaintiffs' position is that neither section 901(b) nor section 903 nor any other section of the Internal Revenue Code permits foreign income tax credits for the payments of excise taxes, severance taxes, mineral royalties, or similar payments made by American companies to foreign countries in which they extract and produce oil. Specifically, Plaintiffs allege that the Treasury Department, in the late 1940's and early 1950's, decided that certain payments denominated as income taxes and collected by foreign countries from companies owned and controlled by United States citizens in connection with the production of oil in those foreign countries would qualify for the foreign tax credit under section 901(b). Plaintiffs assert further that, as a result of these Treasury Department decisions, a pattern developed among the principal oil exporting nations (Saudi Arabia, Kuwait, Libya, Iran and Venezuela), whereby these nations promulgated laws which purported to impose income taxes on American companies extracting and producing oil in their countries. Plaintiffs argue that these income taxes are one of the components of a fixed per barrel "government take" collected by these nations from the companies extracting and producing oil within their boundaries. The "government take" is allegedly calculated on a fixed per barrel basis and is totally independent of the actual gross or net income which the companies derive from their oil extraction and production. Although denominated as income taxes, in Plaintiffs' view these payments are, in substance, either royalties paid for the right to extract oil from land owned by these five nations or excise, severance or similar taxes which are not creditable under section 901(b) of the Code; nor do Plaintiffs see any basis for finding

that these payments constitute taxes "in lieu of" foreign income taxes creditable against United States taxes under section 903 of the Code. Plaintiffs complain that, as a result of these published and private Rulings of the Internal Revenue Service, American oil companies operating abroad pay no tax to the United States Treasury on income derived from the extraction and production of oil, resulting in a revenue loss to the United States Treasury in 1974 of $3 billion.

Plaintiff Field asserts, furthermore, that, as an oil producer extracting and producing oil from a domestic well, he must pay to the owner of the land on which his well is located, a one-eighth interest in the well's production and must treat that royalty payment as an expense which he deducts from his gross income rather than crediting it against his tax due, while the American oil companies operating abroad may credit the purported income taxes which they pay to the sovereign owners of the land from which they extract and produce oil. Plaintiff Field sees these payments as substantially similar operating rights. Plaintiff's injury is allegedly incurred because a substantial portion of the oil produced in these five countries by American companies is exported to the United States where the prices charged by these companies largely determine the market price for uncontrolled crude oil. Their resulting lower United States taxes permit the American companies operating abroad to sell their foreign oil at a lower price than would prevail if those companies could only deduct their oil production-related foreign income tax payments as expenses and not credit them against their United States taxes.

Essentially, then, Plaintiff Field complains that he is unable to credit against his United States tax liability payments which he makes to his landowner as a result of his oil production, while American companies producing oil abroad can obtain tax credits for similar payments which they make to the sovereign nations owning the land from which their oil is extracted and produced. Field alleges that the Revenue Rulings permitting this system are discriminatory and cause him three-fold injury: first, he is injured since the Rulings result in his receiving lower prices than he would obtain otherwise; second, that the value of foreign oil well investments is increased since it yields higher returns, while the value of similar domestic investments is decreased, thus depressing the value of his operating interest in a domestic oil well; and third, that due to these Rulings Defendants do not tax the foreign oil extraction and production income of American companies, causing Plaintiff Field to pay higher federal income taxes. TAA asserts the similar injury of its financial supporters, namely that they have suffered and are continuing to suffer the same burden of higher federal income taxes as a result of Defendants' failure to tax this foreign oil production income.

Defendants raise five objections to the instant suit in their Motion to Dismiss: that Plaintiffs lack standing to sue; that subject matter jurisdiction over this suit is barred by the Anti-Injunction Act, 26 U.S.C. § 7421 and by the tax exception to the Declaratory Judgment Act, 28 U.S.C. § 2201; that personal jurisdiction is barred by the doctrine of sovereign immunity; that this suit is barred by 26 U.S.C. § 7401, which entrusts the civil prosecution of federal tax liabilities exclusively to the Commissioner of Internal Revenue and the Attorney General; and that strong considerations of public policy militate against the suit. Since the Court finds that Plaintiffs do not have standing to bring this suit, it is unnecessary to consider Defendants' other defenses.

Plaintiffs assert two distinct bases for standing to bring this action: that of Plaintiffs Field and TAA as federal taxpayers; and that of Plaintiff Field as the owner of the working interest in a domestic oil well. The first base, federal taxpayer standing, has two aspects. Plaintiff Field and Plaintiff Tax Analysts and Advocates assert standing as

federal taxpayers and pose the issue to the Court whether a federal taxpayer, who does not assert the unconstitutionality of the rulings he challenges or the statutes interpreted by the rulings, may challenge rulings which, in effect, give up revenues. Field and TAA allege the same injury, namely that they are required to bear a proportionately heavier tax burden due to the billions of dollars of income taxes that are not collected because of the rulings. TAA asserts that it is suing on behalf of its supporters who are federal taxpayers, and thus derives its standing from that of its supporters who must bear the same burden as Plaintiff Field. This first aspect of Plaintiffs' federal taxpayer standing argument is grounded in United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), from which Plaintiffs derive their claim that standing is satisfied so long as a clear causal relationship is alleged between the challenged rulings and their injuries as taxpayers. The second aspect of Plaintiffs' federal taxpayer basis for standing is section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1970). Plaintiffs allege that they have suffered the above mentioned tax burden which has caused injury in fact as a result of administrative rulings which, though not unconstitutional, are inconsistent with the Defendants' statutory authority. Plaintiffs further argue that they are within the zone of interests protected by the Internal Revenue Code since it has as one of its goals the equitable administration of tax laws.

The second basis claimed to provide standing originated with Plaintiff Field's ownership of the working interest in the domestic oil well. Since the challenged rulings have allegedly caused Field economic injury in fact, he asserts section 10 of the Administrative Procedure Act, supra, as his statutory basis for standing and further argues that, while the zone of interests test need not and should not be applied, as an investor challenging the favorable IRS treatment received by others, he is within one of the fundamental goals of the Internal Revenue Code of 1954, that of removing existing inequities from the tax system.

## TAXPAYER STANDING

 The Court rejects Plaintiffs' assertion of federal taxpayer standing because neither Field nor TAA on behalf of its taxpayer members meets the rigors of the nexus required by the Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), re-examination of Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), as set out in United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) and Schlesinger v. Reservists Committee To Stop The War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Furthermore, section 10 of the Administrative Procedure Act has not been held applicable to persons who have no other basis for standing to seek judicial review than their status as federal taxpayers. While federal courts may entertain the complaints of persons who allege that government action causes them private competitive injury, as in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), (ADAPSCO), or the complaints of individuals whose enjoyment of economic, recreational and aesthetic opportunities is impaired by government action as in United States v. SCRAP, supra, these types of claims are different from those advanced by Plaintiffs as taxpayers. Both *ADAPSCO* and *SCRAP* alleged particularized injury to an interest protected by a specific statutory provision of the enactment on which the suits were grounded. In *ADAPSCO* the relevant enactment was section 4 of the Bank Service Corporation Act of 1962, 12 U.S.C. § 1864, which provided that no bank service corporation could engage in any activity other than the performance of bank services for banks. In the *SCRAP* case, it was section 102(2)(c) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(c), which required an

environmental impact statement for major Federal actions which would significantly affect the quality of the environment. Such a context does not exist in the suit presently before the Court, since no specific provision of the Internal Revenue Code or any other statute provides support for Plaintiffs' standing as taxpayers. Succinctly stated, as the Supreme Court said in Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 82 L.Ed. 493 (1937), a case in which a taxpayer challenged the validity of a Supreme Court Justice's commission on the ground that he had been nominated and confirmed while a member of the United States Senate, where he had voted for an increase in judicial emoluments:

"It is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public."

And in Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972), the Court discounted the adequacy of motivation to support standing:

"But a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA."

Motivation, then, is not a substitute for the actual injury needed by the courts and adversaries to focus litigation issues and judicial decision making. Schlesinger v. Reservists To Stop The War, 94 S.Ct. at 2934. In the instant case the Court has little doubt that Plaintiffs' motivations are sincere; however the injury they suffer as taxpayers is a general injury incurred by all taxpayers.

In Frothingham v. Mellon, *supra,* our starting point for purposes of this analysis, the plaintiff taxpayer attacks as unconstitutional the Maternity Act of 1921, which provided for federal appropriations to be apportioned among such states as accepted and complied with its provisions relating to the reduction of maternal and infant mortality. The gravamen of the complaint was that these federal appropriations would increase the plaintiff's future tax burden, and thereby take her property without due process of law. Of Frothingham's claim the Court said:

" . . . the relation of a taxpayer of the United States to the federal Government is very different. His interest in the moneys of the Treasury —partly realized from taxation and partly from other sources—is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.

"The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern. If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review, but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned." 262 U.S. at 487, 43 S.Ct. at 601.

Speaking of its power to review acts of Congress for unconstitutionality, the *Frothingham* Court stated that "the party who invokes the power must be able to show, not only that the statute is invalid, but that he has sustained or is im-

mediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Id.* at 488, 43 S.Ct. at 601. This requirement of particularized injury, which pervades all cases where standing has been an issue, forms the crux of this Court's rejection of Plaintiffs' arguments for standing as taxpayers. The injury they allegedly suffer as a result of the challenged IRS rulings has no more impact on Plaintiff Field or TAA and its financial supporters, as taxpayers, than the rulings have on every other federal taxpayer. Their injury is plainly undifferentiated.

*Frothingham* stood for forty-five years as a bar to suits brought against Congressional enactments by individuals who merely asserted the interest of a federal taxpayer. An exception to this doctrine was created by the Supreme Court in Flast v. Cohen 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), in which individuals sought to enjoin the allegedly unconstitutional expenditures of federal funds under Titles I and II of the Elementary and Secondary Education Act of 1965. Standing was based solely on the individuals' status as federal taxpayers. The complaint asserted that federal expenditures used to finance instruction in religious schools contravened the Establishment and Free Exercise clauses of the First Amendment since, in effect, the expenditures constituted compulsory taxation for religious purposes. The *Flast* Court, defining standing, quoted Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962): "The 'gist of the question of standing'" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." The requirement of a "personal stake in the outcome of the controversy" is necessary in terms of Article III limitations so that dis-

putes sought to be adjudicated "will be presented in adversary context and in a form historically viewed as capable of judicial resolution." 392 U.S. at 101, 88 S.Ct. at 1953. For this reason the emphasis in standing problems is on whether the party invoking federal court jurisdiction has a personal stake in the outcome of the litigation and whether the dispute touches on the "legal relations of parties having adverse legal interests." *Id.* Conceding that under some circumstances a taxpayer might have the requisite personal stake, the Court created an exception to the *Frothingham* decision and found no absolute Article III bar to federal taxpayer suits which challenged allegedly unconstitutional federal taxing and spending programs.

The *Flast* Court decided that the federal taxpayer would have the requisite personal stake when he presented a logical nexus between his status as a taxpayer and the claim he sought to have adjudicated, and, to establish this link, the substantive issues of the complaint could be examined. The two-pronged *Flast* test required first that the taxpayer demonstrate a logical link between his status as a taxpayer and the challenged legislative enactment, *i. e.* an attack on an enactment under the taxing and spending clause of the Constitution (Art. I, § 8); and, second, a nexus between the plaintiff's status as a taxpayer and a specific constitutional limitation on the taxing and spending power. The Court noted that it would not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. Thus "a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution" and the "taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated

to Congress by Art. I, § 8." 392 U.S. at 102–103, 88 S.Ct. at 1954. The taxpayers in *Flast* satisfied the double nexus requirement since their challenge was made to an exercise by Congress of its Art. I, § 8 power to spend for the general welfare in a program with a substantial expenditure of federal funds, while at the same time the taxpayers alleged that the challenged expenditures violated the Establishment and Free Exercise Clauses of the First Amendment. The *Flast* exception is a rigid one and the only exception to the *Frothingham* guidelines. Moreover it speaks in terms of constitutional challenges to Congressional action, not executive or administrative action. Since Plaintiffs Field and TAA as federal taxpayers do not assert the unconstitutionality of the IRC provisions in question here, but rather attack administrative rulings of the IRS interpreting those provisions, the Plaintiffs as taxpayers do not fall within the narrow exception of Flast v. Cohen and thus their taxpayer standing arguments must fall, particularly in light of two recent decisions of the Supreme Court in United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) and Schlesinger v. Reservists Committee To Stop The War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), both decided on June 25, 1974.

In *Richardson,* a federal taxpayer sought to have declared unconstitutional certain provisions of the Central Intelligence Agency Act concerning public reporting of CIA expenditures, as violative of Art. I, § 9, cl. 7 of the Constitution which states that a regular statement of account of receipts and expenditures of all public money shall be published from time to time. Of federal taxpayer standing the Court stated that the *Flast* re-examination of *Frothingham* led to the holding that:

> ". . . a 'taxpayer will have standing consistent with Article III to invoke federal judicial power when he alleges that *congressional action* under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power.' [392 U.S.], at 105–106, 88 S. Ct. [1942], at 1955." 94 S.Ct. at 2844.

The *Richardson* Court also made it clear that the *Flast* decision, while lowering slightly the barrier to suits against Acts of Congress by individuals asserting only the interest of federal taxpayers, reaffirmed the *Frothingham* principle "precluding a taxpayer's use of 'a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal system.'" 94 S.Ct. at 2945. The plaintiff in *Richardson* invoked his federal taxpayer status but failed to address his challenge to the taxing and spending clause power. Rather his challenge went to statutes regulating the CIA's accounting and reporting procedures and did not include the expenditure of funds. His complaint did not charge that the CIA funds were being spent in violation of a specific constitutional limitation in the taxing and spending power and thus Richardson failed to establish the *Flast* nexus. Furthermore, the Court viewed Richardson's claim as a "generalized grievance" since the impact on the plaintiff taxpayer was "plainly undifferentiated and 'common to all members of the public.'" 94 S.Ct. at 2946. While the Court recognized that the plaintiff had a genuine interest in the use of CIA funds, and that this interest was prompted by his status as a federal taxpayer, the Court also recognized that Richardson was in no danger of suffering concrete injury as a result of the operation of the CIA statute, and thus invoked the *Sierra Club* doctrine that a mere interest in a problem is not sufficient to support standing. *Id.* Similarly, Plaintiffs Field and TAA and its financial supporters, as federal taxpayers, have not suffered nor are they about to suffer, as a result of Congressional action, concrete, particularized injury, an injury different from that suffered by every other federal taxpayer as a result of the operation of the Revenue Rulings at issue in this suit.

Plaintiffs' complaint, as federal taxpayers, is no more than a generalized grievance shared by every federal taxpayer "plainly undifferentiated and common to all members of the public." In the words of Mr. Justice Stewart's concurring opinion in *Richardson*, " . . . in the absence of a specific statutory grant of the right of review, a plaintiff must allege some particularized injury that sets him apart from the man on the street." 94 S.Ct. at 2955.

The *Schlesinger* case bears more directly on point since it deals with actions of the Executive Branch such as are challenged by Plaintiffs Field and TAA, rather than the legislative enactments challenged in *Flast* and *Richardson*. The plaintiffs in Schlesinger v. Reservists Committee To Stop The War invoked federal court jurisdiction as both citizens and taxpayers and standing was denied them on both counts. They sought a declaration that Art. I, § 6, cl. 2 of the Constitution, the "incompatibility clause", barred a member of Congress from holding a commission in the Armed Forces Reserve and an injunction against the Secretary of Defense and the Secretaries of the Army, Navy and Air Force, enjoining them from continuing the members of Congress in their "commissioned" status. The Court struck down their "citizen" basis for standing by reaffirming, as in *Richardson*, the continued vitality of *Levitt*.

> "We reaffirm Levitt in holding that standing to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share. Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution. It adds the essential dimension of specificity to the dispute by requiring that the complaining party have suffered a particular injury caused by the action challenged as unlawful. This personal stake is what

the Court has consistently held enables a complainant authoritatively to present to a court a complete perspective upon the adverse consequences flowing from the specific set of facts undergirding his grievance. . . . Only concrete injury presents the factual context within which a court, aided by parties who argue within the context, is capable of making decisions." 94 S.Ct. 2932.

Plaintiffs, as taxpayers, in the instant suit have alleged no concrete injury which would impart specificity to their claims. As in *Levitt*, their interest is merely one held by all members of the taxpaying public.

The *Schlesinger* Court also rejected Reservist claims to standing as federal taxpayers in a context which parallels the one before the court. The plaintiffs in *Schlesinger* sought relief from an alleged injury caused by an action of the Executive Branch of government, *i. e.* the Secretaries of Defense, Army, Navy and Air Force permitting members of Congress to retain their commissioned officer status in the Reserve components of their respective Armed Forces. The Supreme Court, basing its decision on *Flast*, held that the Reservists did not have taxpayer standing because they failed to satisfy the nexus required by *Flast*. These plaintiff taxpayers failed to satisfy the *Flast* nexus precisely because they "did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch in permitting Members of Congress to maintain their Reserve status." 94 S.Ct. at 2935.

In *Schlesinger* the Supreme Court clearly rejected an attempt by a federal taxpayer to invoke federal court jurisdiction through his status as a taxpayer because the challenge was to an action of the Executive Branch rather than to a Congressional enactment. The Court has thus reasserted the vitality and the uniqueness of the *Flast* exception to taxpayer suits where standing is based solely on an individual's status as a taxpayer. Plaintiffs Field and TAA and its fi-

nancial supporters, as federal taxpayers, do not challenge the constitutionality of a Congressional enactment, but rather administrative rulings of the executive Branch. Under the tenets of *Schlesinger*, therefore, they cannot satisfy the *Flast* nexus, do not fall within the *Flast* exception to taxpayer suits and must be denied standing as taxpayers to bring the instant suit.

■ Plaintiffs further assert that as taxpayers they have standing under section 10 of the Administrative Procedure Act and also under the Supreme Court decision in United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). The Court rejects these arguments also. Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1970), has never been construed as an exception to the *Flast* doctrine, nor has it been interpreted to provide standing to an allegedly aggrieved party who has no basis for bringing a suit other than his status as a federal taxpayer. It is highly doubtful that this judicial review provision of the APA will ever evolve to the point where it grants standing to an individual whose grievance is shared by every federal taxpayer. Yet this is what Plaintiffs argue to the Court. The Plaintiffs' reliance on the *SCRAP* decision is ill-founded, since it does not afford plaintiffs the relief they seek. Standing of the plaintiffs in *SCRAP* was not based on their status as federal taxpayers. Rather these plaintiffs asserted particularized economic, recreational and aesthetic injuries caused by the adverse environmental impact of the ICC's modification of railroad freight structures. 412 U.S. 669, 678, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). It was not only an APA-based argument but included reliance on a statute of particular significance to their standing, *i. e.* section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C) (1970). This section of NEPA requires a detailed environmental impact statement in every recommendation or report on proposals for legisla-

tion and other major federal actions which significantly affect the quality of the human environment. The ICC had failed to include such a statement in its decision to modify railroad freight structures. Thus the *SCRAP* plaintiffs clearly demonstrated specific harm and injury in fact and the Court noted that there was no dispute that the environmental interest plaintiffs sought to protect was within the zone of interests protected by NEPA. The *SCRAP* plaintiffs clearly met the two-pronged test for establishing standing under section 10 of the APA as set out in *ADAPSCO, supra,* and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Plaintiffs Field and TAA's supporters, as taxpayers, have failed to meet the first requirement of injury in fact since theirs is an injury suffered by every federal taxpayer, a plainly undifferentiated burden common to all members of the public. As for the second aspect of the *ADAPSCO* test, plaintiffs have failed to demonstrate a statutory provision which protects their ill-defined interests as taxpayers. Plaintiffs have referred to the general equitable goals of the Internal Revenue Code as creating a protected zone of interests, but this is not only vague and not codified in the IRC, it is also only one of several goals which include reducing tax barriers to future expansion of production and employment. 1954 U.S.Code Congressional and Administrative News 4025. Plaintiffs refer to no section of the Internal Revenue Code nor to any other statute which creates a zone of interests. Their closest point of approach to this requirement is a general statement in the report of the House of Representatives Committee on Ways and Means accompanying the proposed IRC of 1954. In any event, the APA does not, without more, confer standing on individuals who merely assert their status as taxpayers. Therefore, Plaintiff Field as a taxpayer does not have standing under the APA. Since TAA's standing is derivative of its members, and

they have been shown to lack the requisite injury and protected interests, TAA does not have standing under the APA.

## A.P.A. STANDING

■ The second ground of which Plaintiff Field seeks standing is his status as the owner of the entire working interest in a domestic oil well. As stated above, Field claims that the Rulings in question permit American oil companies extracting and producing oil abroad to sell their oil in the United States at a lower price than would otherwise be possible, *i. e.*, if these companies were not able to deduct the subject payments to foreign countries from their United States tax liability. Since their price effectively sets the market price for crude oil in the United States, Field alleges that he is injured since he receives a lower price for his domestically produced oil than if the oil companies operating abroad charged the higher prices which would be necessitated if they were not able to deduct the payments made to foreign countries from their United States tax liability, as is possible under the current Rulings. Secondly, Field alleges injury to the value of his domestic oil investment. He claims that the Rulings permit a higher return on investment in foreign oil production and thus a decrease in the value of investments such as his in domestic oil production. The Court rejects Plaintiff Field's arguments for standing on the basis of these alleged injuries since it finds that Field has not suffered injury in fact nor does he meet the zone of interests requirements set forth in *ADAPSCO* and Barlow v. Collins.

■■ Plaintiff Field, as the owner of the working interest in a domestic oil well, grounds his standing on section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1970), which provides that:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof."

The controlling cases in this area are Association of Data Processing Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and its companion case Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). In *ADAPSCO* petitioners who sold data processing services to businesses challenged a ruling of the Comptroller of the Currency that, incidental to their banking services, national banks could make data processing services available to other banks and to bank customers. This was a competitor's suit rather than a taxpayer's suit and it is similar to Plaintiff Field's status as a domestic oil producer engaged in competition with foreign oil producers selling crude oil in the United States market. There the similarity ends. Plaintiffs in *ADAPSCO* relied on section 4 of the Bank Services Corporation Act of 1962, 12 U.S.C. § 1864 (1970), which provides that no bank service corporation could engage in any activity other than the performance of bank services for banks, to assert their interests as competitors in the data processing services market; and alleged that competitive economic injury resulted from the Comptroller's ruling. To deal with standing to seek judicial review under the APA, the Court fashioned a three-pronged rule. First, the plaintiff must allege that the challenged action has caused him injury in fact. Second the interest sought to be protected by the complainant must be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Third, judicial review must not have been precluded, such as by statute. 397 U.S. at 152–156, 90 S.Ct. 827. Economic injury is clearly a legally cognizable injury for purposes of standing to seek judicial review. *See* FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869 (1940) and Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942). The *ADAPSCO* Court found

that these petitioners met the three requirements of the standing test. Not only did petitioners allege a loss of future profits due to the added competition from banks, but one named defendant bank was preparing to perform data processing services for two customers with whom one of the petitioners had previously agreed on the performance of such services. Thus the injury in fact standard was met. The Court found further that section 4 of the Bank Services Corporation Act arguably brought a competitor within the zone of interests which it protected. Lastly, the Court found no statute which precluded judicial review of administrative rulings of the Comptroller of the Currency, and plaintiffs were held to have standing to seek judicial review.

Plaintiff Field attacks the second aspect of the *ADAPSCO* framework and argues that the zone of interests test should not be applied. The Court, however, is of the view that the *ADAPSCO* test still governs its action in cases seeking judicial review of administrative actions. Plaintiff bases his argument primarily on the decisions in United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) and Constructores Civiles de Centroamerica, S. A. v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972). Yet the Supreme Court in *SCRAP* said that, as in *Sierra Club,* it was unnecessary to reach the zone of interests issue since it was undisputed that the environmental interests which the plaintiffs sought to protect were within the zone of interests protected by the National Environmental Policy Act. 412 U.S. 669, 686 at n. 13, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In the latter of the two cases relied on by Plaintiff Field, Judge Tamm stated that:

> "Although the Supreme Court's requirement of injury to an interest 'arguably within the zone of interests to be protected or regulated' has been the subject of much critical comment, and some of our decisions indicate that injury in fact alone may suffice to establish standing, we note that un-

der either standard appellant must prevail." 459 F.2d at 1188.

Furthermore, Judge Tamm went on to apply the zone of interests test, citing the Foreign Assistance Act, 22 U.S.C. § 2251 (1970) and Mr. Justice Brennan's discussion of reviewability in Barlow v. Collins, *supra:*

> "Where, as in the instant cases, there is no express grant of review, reviewability has ordinarily been inferred from evidence that Congress intended the plaintiff's class to be a beneficiary of the statute under which the plaintiff raises his claim." 397 U.S. at 174, 90 S.Ct. at 842 (Brennan, J. concurring)

It appears to this Court that while there have been challenges to the second aspect of the *ADAPSCO* test, the Supreme Court and the Court of Appeals for this Circuit have yet to send it to its demise and in fact observe, even when they grant it minimal consideration, that its requirements are satisfied.

Plaintiff cites a line of cases which he claims stand for the proposition that the zone of interests test has been interpreted so broadly that its practical application has been nullified. Yet, in each of these cases, unlike the case at bar, a specific statute was present which protected the plaintiffs' interests. In Peoples v. United States Department of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561 (1970), the court held that there was little doubt that plaintiffs were in the category of those whom Congress intended to benefit from the food stamp program and that this was clear from the statutory provision in the Act safeguarding the health of low income households, 7 U.S. C. § 2011 (1970). In National Helium Corp. v. Morton, 455 F.2d 650 (10th Cir. 1971), plaintiffs complained of the government's failure to file an environmental impact statement and, like the *SCRAP* plaintiffs, relied on the NEPA provision requiring such a statement, 42 U.S.C. § 4332. In Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970), the petitioners were able to rely on 42 U.S.C. § 1455(c) which prohibited grants or loans to a lo-

cal public agency in the absence of an adequate relocation program. In Northwest Residents Ass'n v. HUD, 325 F. Supp. 65 (E.D.Wis.1971) the District Court relied on 12 U.S.C. § 1701(t), of which the statute under which the plaintiffs sued was a component. Section 1701(t) stated that Congress affirmed the goal set forth in 42 U.S.C. § 1441 of a decent home and suitable living conditions for every American family. Lastly, in Armco Steel v. Stans, 431 F.2d 779 (2d Cir. 1970), plaintiff, an American steel producer, was able to invoke the tariff laws which the Second Circuit held were demonstrably intended to protect the competitive interest of the entire class of domestic steel producers.

Plaintiffs place particular weight on the District Court's decision in Eastern Kentucky Welfare Rights Organization v. Shultz, 370 F.Supp. 325 (D.D.C.1973), rev'd. on other grounds, 506 F.2d 1278, D.C.Cir., 1974. This was a class action brought by various health and welfare organizations and several private citizens against the Secretary of the Treasury and Commissioner of Internal Revenue seeking declaratory and injunctive relief. At issue was IRS policy implemented by a revenue ruling which permitted private non-profit hospitals to qualify as charitable institutions under the Internal Revenue Code, 26 U.S.C. §§ 170, 501, without requiring them to admit and provide free or reduced rate services to indigent persons. The court had little difficulty finding injury in fact under the *SCRAP* guidelines since prior to the revenue ruling at issue, IRS policy had in a very real sense conferred a cognizable interest on indigent persons, *i. e.*, requiring hospitals seeking tax advantages under the Code to give indigent persons special consideration. When the challenged revenue ruling was issued, it deleted the requirement that hospitals must care for indigent patients without cost or at rates below cost. As to the zone of interests test, the court found that Congress and the Judiciary had consistently insisted that application of sections 501

and 170 of the Code to hospitals be conditioned on a showing that consideration was given to indigent persons in need of hospitalization. Thus the court concluded that the petitioners had suffered injury to an interest which was cognizable under and protected by the provisions of the Code relating to charitable institutions, sections 501 and 170.

 These facts are very different from those in the case before the court. Plaintiffs Field and TAA have no "prior conferred" interest which has been taken away from them by an administrative ruling of the IRS; nor have the code provisions of sections 901(b) and 903 ever been conditioned on deferential treatment to domestic oil producers. The plain and simple purpose of sections 901(b) and 903 is to prevent double taxation. Burnet v. Chicago Portrait Co., 285 U.S. 1, 7, 52 S.Ct. 275, 76 L.Ed. 587 (1932). They have not been construed otherwise. Furthermore, Judge Parker was aware of the unique aspects of the *Eastern Kentucky* case.

> "The Court is not unmindful of and shares the government's concern for maintaining an efficient tax structure free from potential disruption from challenges by citizens for whom that policy has no actual tax consequence. However, the case *sub judice* presents somewhat of a unique situation in that the tax law in question also bears an identifiable relationship to citizens other than those whose tax returns are immediately affected." 370 F. Supp. at 333.

There simply is no tax consequence to plaintiffs Field or TAA's financial supporters as a result of the revenue rulings they challenge. Moreover, the Code sections under which the rulings lie do not have an identifiable effect on them other than as they affect every other federal taxpayer, and these Code provisions do not create an interest which includes Plaintiff Field as an intended beneficiary.

Plaintiff Field urges Green v. Connally, 330 F.Supp. 1150 (D.D.C.1971),

aff'd. sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971), and McGlotten v. Connally, 338 F.Supp. 448 (D.D.C.1972) upon the Court; yet these cases also involved constructions of the charitable institution provisions of the Internal Revenue Code. In *Green,* sections 170 and 501 of the Code were being used to support private schools which were excluding Negroes. The three judge court concluded that Congressional interest in providing tax deductions and exemptions would not be construed to be applicable to illegal activities. Plaintiffs were Negro federal taxpayers and their minor children who were attending public school in Mississippi. Their position, like the plaintiffs in *Eastern Kentucky,* was one in which application of the tax law in question bore an identifiable relationship to citizens other than those whose tax returns were immediately affected, white citizens who contributed money to the private schools and sought deductions for their contributions. Such application of the tax laws permitted the continuation of racial segregation in schools in violation of the law and in contravention of public policy. McGlotten v. Connally, *supra,* is a similar case. A three judge court held that funds generated by tax benefits to fraternal and non-profit organizations which excluded non-whites *from membership enabled such organiza*tions to maintain their racist membership policies, and that such benefits constituted an endorsement of blatantly discriminatory organizations by the federal government.

Finally, Plaintiff Field suggests that we adopt the court's approach in Tax Analysts and Advocates v. Shultz, 376 F.Supp. 889 (D.D.C.1974), appeal docketed, No. 74–1894, D.C.Cir., Aug. 2, 1974. This suit challenged Revenue Ruling 72–355, 1972–2 Cum.Bull. 532, which stated that gifts of up to $3000 to multiple finance committees organized to receive contributions for the campaign of the same political candidate were to be treated as gifts to the committee and not to the candidate. Thus the gifts qualified for the $3000 exclusion under the gift tax provision of the Code if at least one-third of the officers of the committee were different. As a result of this ruling, millions of dollars were contributed to the campaigns of the 1972 presidential candidates in $3000 increments to many finance committees who then funnelled the money to the central finance committees. Individual donors who contributed hundreds of thousands of dollars in this manner were able to escape the gift tax which would have been imposed if the contributions had been made directly to the central campaign committees. *Plaintiff Field* alleged that he suffered injury in fact due to Rev.Rul. 72–355 because as a taxpaying citizen and small contributor to election campaigns, the Ruling substantially diminished his ability to affect the electoral process and to persuade elected officials to adopt policies and programs he favors, and increased the influence of the large contributor. Plaintiffs were held to have standing. Yet, even though the District Judge viewed the zone of interests test as a collateral matter, she stated that "the Courts have for many years recognized the citizen's right to judicial intervention to vindicate the power of his vote." 376 F.Supp. at 898. The right to an undiluted vote is not a statutory one. It is rooted in our common law heritage and has been judicially recognized. *See* Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and Common Cause et al. v. Democratic National Committee et al., 333 F.Supp. 803 (D.D.C.1971). Whether stated in *ADAPSCO* terms or not, the District Judge in TAA v. Shultz, *supra,* recognized a zone of interests uniquely applicable to plaintiffs seeking vindication of their voting rights.

Plaintiff Field as a domestic oil producer has met neither the two-pronged test of *ADAPSCO* nor the causal relationship he raises under *SCRAP.* The complaint does not essentially evince the lines of a competitor's suit, since there is no allegation of a loss of profits to which Field is entitled under an interest

created by statute as in *ADAPSCO*. Nor is Field's complaint addressed to an economic injury which is caused by failure to comply with a statutory procedure designed to ensure the survival of a protected interest as in *SCRAP*. Field's complaint as a domestic oil producer is merely that he claims to be making less money than he would if foreign oil producers charged a higher price for the oil they sell in the United States. In fact, Field admits that the price per barrel for oil produced from his well has increased from $4.35 per barrel in 1973 to its current level of $10.28 per barrel. It is difficult to perceive injury to Mr. Field in this context of a current price which is 2.4 times greater than it was less than two years ago. Field's allegation concerning the decrease in the value of his investment is similarly lacking in substance. Field has offered no evidence of his injury as a domestic oil producer or the cause of his lower investment return.

Field has also failed to meet the zone of interests requirement. He is able to point to no statutory provision in the Internal Revenue Code or elsewhere which creates an interest protecting the claims he seeks to vindicate. As has been pointed out, sections 901(b) and 903 had as their purpose avoidance of the evil of double taxation. Field points to the general introduction to the report of the House Ways and Means Committee on the bill which eventually became the 1954 Code. Yet this reference to an equitable tax code does not create a special interest under which plaintiffs can prosecute this case. Moreover, it is only one of several general goals of the 1954 Code. As tenuous as the *SCRAP* plaintiffs' claim may have been, it was buttressed by NEPA. Finally, looking beyond statutory boundaries, the Court is unable to find that Plaintiff Field's claim is uniquely preserved in the common law and sheltered by judicial recognition. Field simply has not demonstrated a zone of interests surrounding his claim.

There is another factor which the Court must consider in this case and that is the public policy which will be served by this court's decision. As the Supreme Court stated in *Flast*, justiciability, of which standing is one aspect, is a "blend of constitutional requirements and policy considerations. And a policy limitation is 'not always clearly distinguished from the constitutional limitation.'" 392 U.S. at 97, 88 S.Ct. at 1951, 20 L.Ed.2d 947. Initially, of course, the Court is aware of the Executive Branch's concern for the potential wave of law suits which could deluge the IRS and leave it floundering for time and people to continue its normal responsibilities of revenue collection. The Court is further aware of the potential burden this would place on the federal judiciary, and, while it doubts that an unruly mob would charge the doors of federal courts to take on the rigors of litigation, the Court does feel that the standards required of litigants to present a case or controversy within the meaning of Article III must be upheld.

Beyond that consideration, however, is concern that the Court is treading close to the border of a political question. The revenue rulings at issue here are Executive Branch decisions which have particular relevance today to the conduct of foreign affairs by this country. These rulings do not simply interpret Code provisions which have only internal ramifications. Rather they are responses to the acts of sovereign nations with whom the United States is at present engaged in a delicate relationship. The courts' lack of expertise in foreign affairs has led to a longstanding deference to the Executive Branch in such matters and that deference is an appropriate policy for consideration in the instant suit, although not controlling since the Court has found that Plaintiffs do not have standing to bring this suit.