**AMERICAN SOCIETY OF TRAVEL AGENTS, INC., et al., Appellants,**

v.

**Michael BLUMENTHAL, Secretary of Treasury, et al.**

**No. 75–1782.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 20, 1976.

Decided Sept. 15, 1977.

Rehearing Denied Nov. 1, 1977.

---

**91.** *See* note 20, *supra.*

Thomas J. Bacas, Washington, D. C., with whom Paul S. Quinn, Washington, D. C., was on the brief, for appellants.

Leonard J. Henzke, Jr., Atty., Tax Div., Dept. of Justice, Washington, D. C., with whom Scott P. Crampton, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Ann B. Durney, Atty., Tax Div., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before BAZELON, Chief Judge, and McGOWAN and ROBB, Circuit Judges.

Opinion for the court filed by McGOWAN, Circuit Judge.

Dissenting opinion filed by BAZELON,* Chief Judge.

* The dissenting opinion filed by Chief Judge Bazelon in this case is also to be filed as a dissent to No. 75–1304, *Tax Analysts and Advocates v. Blumenthal,* 184 U.S.App.D.C. ——, 566 F.2d 130 (1977).

McGOWAN, Circuit Judge:

This is an appeal from the District Court's dismissal of a complaint challenging the administration of the federal tax laws, not in relation to the tax liabilities of plaintiffs-appellants, but as to third parties not before the court. It thus presents a threshold issue of standing to sue reminiscent of Justice Stewart's observation, concurring in *Simon v. Eastern Kentucky Welfare Rights Organization, et al.*, 426 U.S. 26, 46, 96 S.Ct. 1917, 1928, 48 L.Ed.2d 450 (1975), that he could not "imagine a case, at least outside the First Amendment area, where a person whose own tax liability was not affected ever could have standing to litigate the federal tax liability of someone else." Because *Eastern Kentucky*—an obviously relevant case—was pending before the Supreme Court at the time this appeal was first scheduled for oral argument, we deferred our consideration to await the Supreme Court's outcome. We now hold, by reference to the Supreme Court's disposition of *Eastern Kentucky*, that there was a fatal want of standing here; and we affirm the District Court's judgment for that reason.

I

Appellants, the American Society of Travel Agents (ASTA) and several individual travel agencies, complain of the failure of the federal tax authorities to assess taxes upon certain income received by the American Jewish Congress (AJC) and other organizations enjoying tax exemptions under § 501(c)(3) of the Internal Revenue Code.[1] In particular, they object to the tax-exempt treatment accorded to income derived from the operation of travel programs by § 501(c)(3) organizations. Appellants assert that such income should be taxed as so-called unrelated business income, *i. e.*, income obtained from a business the conduct of which is "not substantially related . . . to the exercise of performance . . . [of the] purpose or function constituting the basis" for an organization's § 501 exemption. *See* I.R.C. § 513(a). Alternatively, appellants contend that the AJC and other exempt organizations have become so heavily involved in the travel business that their § 501(c)(3) exemptions should be eliminated altogether.

By memorandum order, the District Court decided that neither count of appellants' complaint stated a claim upon which relief could be granted. 36 A.F.T.R.2d 75–5142 (D.D.C. May 23, 1975). It observed that allegations like those raised by plaintiffs would necessitate "careful consideration of the particular facts and circumstances of each case." Unwilling to embark upon such an enterprise, the court declared that its jurisdiction could "not be invoked to undertake continuing supervision of IRS's administration of the Internal Revenue Code."

The District Court's reluctance to become embroiled, at the instance of taxpayers not directly involved, in the intricacies of tax law enforcement is both understandable and far from irrational in terms of jurisdictional principles. However, we believe that, looking to the Supreme Court's opinion in *Eastern Kentucky*, dismissal of appellants' action should be accomplished by resolution of the preliminary question of standing. We conclude that appellants

---

1. I.R.C. § 501(c)(3) (as amended, 1976) contains the following list of exempt organizations:

Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

have failed to demonstrate any actual injury resulting from appellees' administration, with respect to third parties, of the statutory provisions governing tax-exempt organizations. We find that appellants here, like the complainants in *Eastern Kentucky*, "have failed to carry [the] burden" of establishing "that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." 426 U.S. at 45, 96 S.Ct. at 1927, quoting *Warth v. Seldin*, 422 U.S. 490, 505, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

## II

Appellants' basic grievance may be simply stated. Private travel agents earn their livelihood, primarily on a commission basis, through the sale of transportation and travel-related services in both domestic and foreign markets. One especially common function performed by travel agents is the arrangement of so-called tour packages, consisting of transportation, accommodations, meals, and a variety of other features. Such packages are sold together at one price, a portion of which the agent retains as a commission.

Appellants allege that, in recent years, a number of tax-exempt organizations, including the AJC, have become increasingly involved in preparing tour packages and offering such packages to their members. Appellants further allege that the tax-exempt status of these organizations has enabled them to sell tour packages at prices lower than those which private travel agents must charge in order to earn a reasonable profit. Thus, so it is said, the AJC and other unspecified organizations have improperly used their tax exemptions to obtain an unfair competitive advantage in the sale of tour packages.

Operation of an extensive travel program is, in appellants' view, substantially unrelated to the religious, charitable, scientific, or educational purposes which justify many § 501(c)(3) exemptions, including that enjoyed by the AJC. Consequently, appellants urge that income from such a travel program should be subjected to the same tax treatment accorded to income earned by ordinary ASTA members. Somewhat less vigorously, appellants maintain that if the § 501(c)(3) organizations at issue conduct travel businesses of significant size, then those organizations are no longer operated "exclusively" for religious, charitable, scientific, or educational purposes, and thereby forfeit their § 501(c)(3) exemptions.

■ We do not reach the merits, because we believe appellants have not alleged any judicially cognizable "injury in fact," and thus have failed to establish their standing to bring this suit. "Injury in fact" has long been regarded as the foremost standing prerequisite, and the only one of constitutional dimension. *See, e. g., United States v. SCRAP*, 412 U.S. 669, 686–89 & n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and *Flast v. Cohen*, 392 U.S. 83, 99–101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Under Article III of the Constitution, federal courts are limited to the adjudication of cases and controversies. In order to guarantee the adversarial litigation posture demanded by this constitutional language, plaintiffs seeking to invoke federal court jurisdiction have been required to demonstrate that they have suffered some actual injury attributable to defendants.

Here, appellants claim to have been injured by appellees' improper administration of the Internal Revenue Code, and seek injunctive relief. However, appellants have not indicated with sufficient specificity either the manner in which their alleged injury occurred or the nature of that injury. Appellants point to no prospective customers who spurned the services of ASTA members because of appellees' allegedly inequitable tax treatment of § 501(c)(3) organizations. Nor do appellants identify tour package purchasers who in fact patronized the AJC or some other tax-exempt organization, but who might legitimately be expected to do business with a private travel agent in the event appellees enforced the relevant tax code provisions according to appellants' recommendations. Instead, ap-

pellants complain in more abstract terms, alleging injury arising from appellees' creation of an unfair competitive atmosphere, and seeking relief in the form of the more congenial competitive environment which would supposedly result from proper tax enforcement policy. We regard this sort of injury claim as too speculative to support standing under the circumstances presented here.

We conceive that this disposition is not only sustained, but also largely mandated, by *Eastern Kentucky*. In that case, several indigents and organizations composed of indigents attacked a 1969 Revenue Ruling which revised the criteria under which non-profit hospitals might qualify for tax-exempt status as charitable institutions. In particular, the challenged ruling eliminated the requirement contained in a 1956 ruling to the effect that a non-profit hospital desirous of charitable classification "must be operated to the extent of its financial ability for those not able to pay for the services rendered." Deletion of this language, argued the *Eastern Kentucky* plaintiffs, was directly responsible for several refusals by tax-exempt hospitals to provide needed services to individuals unable to pay a deposit or advance fee. Plaintiffs further alleged that similar refusals could be expected in the future if the offending Revenue Ruling was not changed.

■ As indicated above, the Supreme Court held that "[s]peculative inferences are necessary to connect [plaintiffs'] injury to the challenged actions . . . ," and

"[m]oreover, the complaint suggests no substantial likelihood that victory in this suit would result" in receipt of the hospital treatment desired. 426 U.S. at 45–46, 96 S.Ct. at 1927–1928. The Court explained its conclusion by commenting upon what it perceived as the tenuous connection between the injury suffered and the relief sought by plaintiffs:

[I]t does not follow . . . that the denial of access to hospital services in fact results from petitioners' new Ruling, or that a court-ordered return by petitioners to their previous policy would result in these respondents' receiving the hospital services they desire. It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' "encouragement" or instead result from decisions made by the hospitals without regard to the tax implications.

It is equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services. So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forego favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services.[2]

*Id.* at 42–43, 96 S.Ct. at 1926.

■ ASTA's complaint in the appeal before us reveals inadequacies closely compa-

---

2. Justice Powell's opinion for the Court made clear that the finding of a standing deficiency in *Eastern Kentucky* rested upon a constitutional foundation.

[W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation.

    *   *   *   *   *   *

The necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement.

    *   *   *   *   *   *

The standing question in this suit therefore turns upon whether any individual respondent has established an actual injury, or whether the respondent organizations have established actual injury to any of their indigent members.

    *   *   *   *   *   *

[T]he "case or controversy" limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant . . .

*Id.* at 38–41, 96 S.Ct. at 1924–1926 (footnotes omitted).

In a recent case decided by another panel of this court, inquiries relating to causation and redressability of an alleged injury are charac-

rable to those which afflicted the pleadings filed by the indigents and indigent organizations in *Eastern Kentucky*. Appellants here must rely solely on speculation in their attempt to assert that their business or profits would improve in the event that appellees began to tax the travel-related income of § 501(c)(3) organizations. Appellants have not demonstrated that they would reap any tangible benefit if the court were to order the relief sought.

As appellees argue in their supplemental memorandum, the lower cost of the tour packages offered by the AJC and other tax-exempt organizations may well be attributable at least in significant part to the use of volunteer labor or the willingness to accept lower profits than would commercial travel agents. Moreover, even if appellants were to prevail in this suit, members of § 501(c)(3) organizations might for a variety of reasons continue to prefer the travel programs operated by their own organizations. Alternately, such organizations

might shift to tour packages whose religious or educational orientation would be more readily apparent. A third possibility is that travel by members of § 501(c)(3) organizations would simply decline.

If any of these consequences, or some combination of them, ensued from a decision favorable to appellants, private travel agents would enjoy no gain whatever from their successful litigation. This is precisely the sort of situation in which the Supreme Court failed to find standing in *Eastern Kentucky*.[3]

■ By emphasizing their asserted competitor status, appellants seek to distinguish *Eastern Kentucky*. Appellants contend that, as competitors of the AJC and certain other § 501(c)(3) organizations, they are entitled to protest tax treatment of such organizations in federal court.[4] For support of their position, appellants rely heavily on *Association of Data Processing Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct.

---

terized as "prudential limitations." *Tax Analysts and Advocates v. Blumenthal*, No. 75–1304, 184 U.S.App.D.C. at ———, 566 F.2d at 137–138 (1977); and see also *Harrington v. Bush*, 180 U.S.App.D.C. 45, 553 F.2d 190, 206 n. 68 (1977), where such inquiries are portrayed as being separate and apart from the "constitutional threshold of injury-in-fact". The implication of these statements is that, although considerations of causation or redressability may conceivably operate to deprive particular plaintiffs of standing, such factors can in no event rise to the level of constitutional significance. Justice Powell's words in *Eastern Kentucky*, especially the passages quoted above, are at odds with this approach. Causation and redressability, far from being prudential matters to be evaluated *seriatim* only after constitutional standing has been established, are part and parcel of the "injury in fact" requirement arising from the "case or controversy" language in Article III. Causation and redressability thus represent not additional independent standing hurdles which prospective litigants must clear, but rather identifiable aspects of the "injury in fact" test which has long been recognized as the primary standing criterion in the federal courts.

3. Although Justice Stewart's concurring statement in *Eastern Kentucky* dramatically denotes the special problems attendant upon the establishment of standing in the tax cases, under the circumstances of this case we find, as did the *Eastern Kentucky* majority, no need to reach "the question of whether a third party ever

may challenge IRS treatment of another." 426 U.S. at 37, 96 S.Ct. at 1923. The conventional "injury in fact" prerequisite was simply not met by appellants in the record before us.

4. Appellants also rely on their competitor status to establish that they are within the "zone of interests to be protected or regulated by" the relevant Internal Revenue Code provisions. The so-called "zone of interests" test stems from the Supreme Court's companion opinions in *Association of Data Processing Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) and *Barlow v. Collins*, 397 U.S. 159, 164–65, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). As the Court observed in *Eastern Kentucky*, the "zone of interests" test presents "a second, nonconstitutional standing requirement." 426 U.S. at 39 n. 19, 96 S.Ct. 1917. In an effort to demonstrate that the "unrelated business" concept was incorporated into the Code in order to protect competitors of tax-exempt organizations, appellants point to both the legislative history of I.R.C. § 513 and the regulations promulgated regarding that section. *See, e. g.,* H.R.Rep. No. 2319, 81st Cong., 2d Sess. 36 (1950); S.Rep.No. 2375, 81st Cong., 2d Sess. 27–31 (1950), U.S. Code Cong. Serv. 1950, p. 3053; and 26 C.F.R. § 1.513–1(b) (1976). Given our disposition of this case under the "injury in fact" rubric, we need not address appellants' "zone of interests" argument.

827, 25 L.Ed.2d 184 (1970). In that case, the Court held that private competitors had standing to challenge a ruling by the Comptroller of the Currency which allowed national banks to provide data processing services to other banks and bank customers. Appellants emphasize that the Supreme Court has, in its *Eastern Kentucky* opinion, recently reaffirmed the vitality of the *Data Processing* decision. *See* 426 U.S. at 45 n. 25, 96 S.Ct. 1917.

Our response is threefold. First, the rather cryptic phrasing of *Data Processing* does not clearly define the contours of competitor standing as conceived by the Supreme Court. The opinion by Justice Douglas for the Court provides little guidance as to the precise nature of the requirements which must be satisfied before competitor standing can be sustained.[5]

Secondly, and more significantly, *Data Processing* was not a tax case. Whatever may be the impact of competitor standing when ordinary administrative action is at issue, we do not believe that *Data Processing* should be read to endorse standing for any private business, individual or corpo-

rate, which wishes to contest the tax treatment of a competitor.

Finally, § 501(c)(3) organizations occupy a different posture with respect to the sale of tour packages than did the national banks with respect to the provision of data processing services. Here, the AJC and other such groups will clearly remain free to pursue their travel businesses, however the tax status is finally resolved. By contrast, in *Data Processing*, if the Comptroller of the Currency's ruling had been overturned on judicial review, the offering of data processing services by national banks would have been *illegal*, and petitioners undoubtedly would have faced no further competition from that source, absent statutory revision.

For all these reasons, we do not believe that the *Data Processing* decision controls the standing issue in the present litigation.[6] Since we are convinced that the *Eastern Kentucky* analysis of standing is the one we are bound to apply in this case, and that under it appellants lacked standing to maintain this suit, the judgment of dismissal is affirmed.[7]

*It is so ordered.*

5. Two examples may be cited. The first involves the identity of the parties who must be sued by a litigant alleging competitor standing. In *Data Processing*, one of the respondents was American National Bank & Trust Company, a national bank which was offering data processing services pursuant to the controverted ruling by the Comptroller of the Currency. Justice Douglas's opinion does not disclose whether a successful claim of competitor standing necessitates naming one or more specific competitors as party opponents. Here, only the Secretary of the Treasury and the Commissioner of Internal Revenue were named as defendants. No organizations holding § 501(c)(3) tax exemptions were made parties. We note that in *Eastern Kentucky*, Justice Powell stressed the fact that no tax-exempt hospital was a defendant. *See* 426 U.S. at 41, 96 S.Ct. 1917. Also omitted from the *Data Processing* opinion was all discussion of the chain of causation connecting the challenged administrative action to the injury allegedly suffered by competitors of regulated enterprises. That chain was patently much shorter and more direct in *Data Processing* than it is in this case.

6. In *Tax Analysts, supra* note 2, a panel of this court recently found economic injury in fact, adequate to meet the Article III test of stand-

ing. Appellant in that case was the owner of a small domestic oil well. Rightly or wrongly, he characterized himself as a competitor of the major oil companies producing and importing oil from abroad. He claimed to have suffered economic harm because the IRS had acquiesced in the tax credit treatment of certain sums paid by large oil companies to foreign governments. Appellant in *Tax Analysts* asserted that these sums represented foreign excise taxes or royalties, not foreign income taxes, and that therefore, they should be treated as deductible business expenses, not tax credits. Having found such allegations sufficient to establish injury in fact, the *Tax Analysts* panel then addressed the prudential "zone of interests" test, and found that the courthouse door was barred on that score. By reason of this latter finding, the panel did not think it necessary to pursue what it termed the "two additional prudential limitations relating to causation and redressability of the grievance . . ." 184 U.S.App.D.C. at ——, ——, 566 F.2d at 138 (footnote omitted); and see note 2 *supra*.

7. The dissent observes of the foregoing opinion that "it constructs a constitutional standard of injury in fact that would effectively preclude taxpayer suits claiming competitive injury."

152

BAZELON, Chief Judge, dissenting in No. 75–1304, *Tax Analysts and Advocates v. Blumenthal,* 184 U.S.App.D.C. ——, 566 F.2d 130, and in No. 75–1782, *American Society of Travel Agents, Inc. v. Blumenthal.*

Two panels of the Court hold, for partially inconsistent reasons, that a taxpayer suffering competitive injury lacks standing to challenge tax rulings applicable to a third party. Because I disagree with the reasoning of both panels, I must respectfully dissent.

The word "constructs" is hardly an apt characterization of the majority's effort, in purpose and effect, to follow as faithfully as possible the Supreme Court's disposition of *Eastern Kentucky*—the case which, prior to that disposition, all members of the panel appeared to regard as almost certainly controlling.

It would thus seem that the dissent's quarrel is essentially with the approach taken by the Supreme Court majority in *Eastern Kentucky,* and not with anything the panel majority has itself contrived. The dissent asserts that that approach is an impolitic and unwarrantable return to the rigors of common law pleading, and one that is incompatible with a rational determination of accessibility to the federal courts. Although in this instance the dissent purports to see distinctions which enable it to assert that *Eastern Kentucky* was rightly decided by the Supreme Court, it is manifest that this is not an undertaking it finds either necessary or congenial. As is usually the case in such circumstances, the differentiations here made in terms of economic probabilities are less than conclusive.

It is no disrespect to the Supreme Court to say that the concept of standing appears to be undergoing development. *Warth v. Seldin, supra,* and *Eastern Kentucky,* with their new emphasis upon causation and redressability, indicate that at least a majority of the Court is no longer content with a constitutional concept of injury in fact limited to an assurance that the interest asserted will guarantee an effective adversarial presentation. Causation and redressability have now explicitly been comprehended within that concept. Whether this is only a tightening up of pleading requirements, or whether it is a way station on the road to a holding of nonjusticiability in certain classes of litigation, neither we nor the dissent can say. In such circumstances it is surely the function of an intermediate appellate court to be guided by standing requirements as they are currently articulated by the Supreme Court in closely comparable contexts.

1. The majority opinion in No. 75–1782, *American Society of Travel Agents, Inc. v. Blumen-*

I have decided to write a common dissent on both decisions because I believe that, although each panel develops a different aspect of standing doctrine, both are in fact responding to a common but implicit apprehension of taxpayer standing.[1] I share that apprehension. The spectre of the Internal Revenue Service (IRS) defending a multiplicity of suits challenging the tax liabilities of third parties is not a happy one.[2] Taxes and courts are a volatile political combination; our jurisdiction in this area has for that reason been circumscribed by statute.[3]

*thal,* states with admirable candor that the case "presents a threshold issue of standing to sue reminiscent of Justice Stewart's observation, concurring in *Simon v. Eastern Kentucky Welfare Rights Organization, et al.,* 426 U.S. 26, 46, 96 S.Ct. 1917, 1928, 48 L.Ed.2d 450 (1975), that he could not 'imagine a case, at least outside the First Amendment area, where a person whose own tax liability was not affected ever could have standing to litigate the federal tax liability of someone else.' " Maj. op. at —— of 184 U.S.App.D.C., at 147 of 566 F.2d. Although the opinion does not directly address this question, it constructs a constitutional standard of injury in fact that would effectively preclude taxpayer suits claiming competitive injury. The majority opinion in No. 75–1304, *Tax Analysts and Advocates v. Blumenthal,* 184 U.S.App.D.C. ——, 566 F.2d 130, explicitly declines to address the issue of "whether a third party ever may challenge IRS treatment of another". Maj. op. at —— n. 90 of 184 U.S.App.D.C., at 145 n. 90 of 566 F.2d. However, the discussion of the "zone of interests" test in the opinion seems designed, "as a prudential matter," *id.* at ——, 566 F.2d at 145, to *eliminate such challenges from a federal forum.*

2. On the other hand, it must be recognized that the Code is a statutory system designed delicately to balance the relationships among economic entities. To permit tax liability to be challenged only by the taxpayer himself is in effect to permit the IRS virtually unfettered discretion in adjusting these economic interrelationships. The spectre of such unreviewable discretion, especially when, as is alleged in these two cases, it is exercised in contradiction to the commands of Congress, is also discomforting.

3. 26 U.S.C. § 7421(a), for example, provides that, except in certain exceptional circumstances, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against

But whether a federal forum should be closed to such suits is a profound and complicated issue, and at base one that should be decided by Congress. At present Congress has decided that we do have jurisdiction to hear cases such as those presently before us,[4] and we are obligated to exercise this statutory jurisdiction.

Appellants have alleged circumstances that would have justified standing had they been seeking review of an ordinary administrative ruling. What concerns me most deeply about these decisions is that both deny appellants standing not on principles specifically applicable to taxpayers suits, but on the basis of general doctrines of the law of standing. The consequence is that general standing law is distorted to accommodate the purpose of shielding the IRS.

In No. 75–1782, *American Society of Travel Agents, Inc. v. Blumenthal*, appel-lants, numerous commercial travel agencies and the American Society of Travel Agents (ASTA), a non-profit corporation organized to represent the professional interests of travel agents, allege that certain organizations tax exempt under 26 U.S.C. § 501(c)(3),[5] and the American Jewish Congress (AJC) in particular, actually package and offer to the public large scale commercial travel programs. Appellants argue that such commercial activities are illegal in corporations exempt under § 501(c)(3),[6] and that appellants are injured by this illegality since tax-exempt organizations can offer travel programs more cheaply than tax-paying organizations.[7] They ask that the AJC and similar organizations be deprived of their tax-exempt status, or, in the alternative, that income from these commercial programs be taxed under 26 U.S.C. 511(a).[8] The majority holds that appellants fail to meet the Article III requirement of

whom such tax was assessed." The purpose of the statute is "to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." *Enochs v. Williams Packing and Navigation Co., Inc.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962). Our jurisdiction is similarly limited in the area of federal taxes by the Declaratory Judgment Act, which authorizes courts of the United States to issue declaratory judgments "except with respect to Federal taxes . . . ." 28 U.S.C. § 2201.

4. In *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 36–37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the Supreme Court specifically left open the question of whether statutory or immunity bars would ever permit a third party to "challenge IRS treatment of another." This court has held, however, that since 26 U.S.C. § 7421(a) only forbids suits instigated "for the purpose of *restraining* the assessment or collection of any tax", (emphasis added), it does not bar suits seeking to compel the *collection* of taxes. *Eastern Kentucky Welfare Rights Org. v. Simon*, 165 U.S.App.D.C. 239, 245, 506 F.2d 1278, 1284 (1974), *vacated on other grounds*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). We have also held that the scope of the prohibition in the Declaratory Judgment Act, 28 U.S.C. § 2201, is "coterminous" with that of 26 U.S.C. § 7421(a), *id.*, 165 U.S.App.D.C. 245–46, 506 F.2d at 1284–85, and hence that in suits seeking to compel the collection of taxes we are authorized to provide declaratory relief.

5. 26 U.S.C. § 501(c)(3) exempts from taxation
   [c]orporations and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

6. Complaint ¶¶ 22, 23.

7. *Id.* at ¶ 24.

8. 26 U.S.C. § 511(a) imposes on corporations subject to § 501(c)(3) a tax on "unrelated business taxable income." "Unrelated business" is defined in § 513(a) to mean
   any trade or business the conduct of which is not substantially related . . . to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 . . . . .

injury in fact. Because I believe that appellants have alleged ordinary competitive injury sufficient to meet the standards set out in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), I dissent from this holding.

In No. 75–1304, *Tax Analysts and Advocates v. Blumenthal*, —— U.S.App.D.C ——, 566 F.2d 130, the majority denies standing to appellant Tax Analysts and Advocates (TAA), a non-profit corporation organized for the purpose of promoting tax reform, and to appellant Thomas Field, a United States taxpayer and owner of the entire working interest in a currently producing oil well in Pennsylvania. Appellants seek to challenge published [9] and private [10] rulings by the IRS that taxes imposed by Saudi Arabia, Libya, Iran, Kuwait and Venezuela are "income" taxes, and thus can be credited against U.S. tax liability under 26 U.S.C. § 901(b).[11] Appellants allege that these taxes are in fact either royalties or "excise, severance, or similar taxes not creditable under Section 901(b)." [12]

Appellant Field and appellant TAA as a representative of its tax-paying members, claim injury as taxpayers. They allege that the illegal IRS rulings cost the U.S. Treasury approximately $3,000,000,000 in 1974, and argue that this loss causes them to pay higher federal income taxes.[13] Appellant Field, in addition, claims that he is injured as a competitor of those oil companies who benefit from the illegal IRS rulings. Field alleges that since the prices charged by these companies for imported oil largely determine the market price for the uncontrolled crude oil of domestic independent producers, he receives a lower price for his oil than would be the case if such companies could only deduct these foreign taxes from their gross income rather than illegally credit them.[14] Moreover, since domestic producers can only deduct the royalties they pay to the land owners of their oil wells,[15] Field claims that investment in foreign oil production is relatively more profitable and attractive. Field alleges that the IRS rulings thus "depress the value of his operating interest in a domestic oil well." [16]

The majority denies standing to both Field and the TAA in their capacities as mere taxpayers.[17] Because as taxpayers appellants have not met the "nexus" text of *Flast v. Cohen*, 392 U.S. 83, 102–03, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968),[18] and have alleged only a "generalized grievance" the impact of which "is plainly undifferentiated and 'common to all members of the public . . .' *Ex parte Levitt*, 302 U.S. 633,

---

**9.** *See* Revenue Ruling 55–296, 1955–1 Cum. Bull. 386; Revenue Ruling 68–552, 1978–2 Cum.Bull. 306.

**10.** *See* Amended Complaint ¶ 10, Joint Appendix (JA) at 41.

**11.** 26 U.S.C. § 901(b) permits a U.S. citizen or domestic corporation to receive a tax credit for "the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country . . . ."

**12.** Amended Complaint ¶ 14, JA at 42.

**13.** Amended Complaint at ¶¶ 14, 20, 21, JA at 42, 44.

**14.** Amended Complaint at ¶ 18, JA at 43–44.

**15.** Appellant Field pays a royalty of one-eighth of the proceeds of all oil produced from his well to the owners of the land on which the well is located. These royalties are expected to amount to $46.32 per year for the next five years. See the findings of the District Court, *Tax Analysts and Advocates v. Simon*, 390 F.Supp. 927, 929–30 (D.C.C.1975).

**16.** Amended Complaint ¶ 19, JA at 44.

**17.** The majority affirms the District Court's finding of no injury in fact and adopts its reasoning at 390 F.Supp. 932–38. Maj. op. at —— n. 10 of 184 U.S.App.D.C., at 134 n. 10 of 566 F.2d.

**18.** *Flast* focused on the "logical nexus between the status asserted and the claim sought to be adjudicated." The decision held that there were two aspects to the nexus required to sustain taxpayer's standing. "First, the taxpayer must establish a logical link between [federal taxpayer] status and the type of legislative enactment attacked. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged." 392 U.S. at 102, 88 S.Ct. at 1953, 1954.

634, [58 S.Ct. 1, 82 L.Ed. 493] (1937)",[19] I concur in that holding.[20]

The majority also denies appellant Field standing. It concedes that Field has suffered injury in fact sufficient to meet Article III standards,[21] yet it finds that Field has failed the second of the standing tests enunciated in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). It concludes that the interests Field seeks to protect are not "arguably within the zone of interests to be protected or regulated" by § 901(b). In reaching this conclusion the majority is forced to construe the "zone of interests" test in an unsupportable manner, capable of causing unforeseeable mischief in other areas of standing law. I dissent both from the majority's conclusion and from its construction.

## I.  INJURY IN FACT

Article III of the Constitution limits federal court jurisdiction to actual cases or controversies. The question of standing "focuses on the party seeking to get his complaint before a federal court", *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), in order to determine if he "has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Two aspects of the case and controversy standard are important for

the law of standing. The first is that cases and controversies must be adversary; that is, they must be disputes over actual or threatened injuries. Thus standing exists "only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .' *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, [93 S.Ct. 1146, 1148, 35 L.Ed.2d 536] (1973)." *Id.* at 499, 95 S.Ct. at 2205. Second, cases and controversies must "be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). Thus federal courts cannot, consistent with Article III, issue advisory opinions. *Id.* at 96–97, 88 S.Ct. 1942. Standing requires that a plaintiff demonstrate "an injury to himself that he is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).[22] *Eastern Kentucky* makes clear that an injury capable of being redressed is one that can fairly "be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Id.* at 41–42,[23] 96 S.Ct. at 1926.

**19.**  *United States v. Richardson*, 418 U.S. 166, 176–77, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974).

**20.**  I do not agree, however, with the majority's conclusion that appellants have suffered no injury in fact. Maj. op. at —— n. 10 of 184 U.S.App.D.C., at 134 n. 10 of 566 F.2d. A generalized grievance is a grievance nonetheless. Since injury in fact is a constitutional prerequisite of standing, the taxpayer in *Flast* must have suffered such an injury. Nevertheless, the Supreme Court has held that as a prudential matter, a grievance "shared in substantially equal measure by all or a large class of citizens" should normally not "warrant exercise of jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Congress can, of course, "either expressly or by clear implication" override this prudential considera-

tion. *Id.* at 501, 95 S.Ct. at 2206. Appellants, however, have pointed to no statute in which Congress has either expressly or implicitly authorized a right of action for generalized taxpayer grievances.

**21.**  Maj. op. at —— of 184 U.S.App.D.C., at 138 of 566 F.2d.

**22.**  *See United States v. Evans*, 213 U.S. 297, 29 S.Ct. 507, 53 L.Ed. 803 (1909).

**23.**  Like the majority in *Travel Agents*, I disagree with the observation in *Tax Analysts* that "causation" and "redressability" are merely "prudential limitations" on standing. See *Tax Analysts* at —— —— of 184 U.S.App.D.C., at 137–138 of 566 F.2d; *Travel Agents* at —— n. 2 of 184 U.S.App.D.C., at 149 n. 2 of 566 F.2d.

It is, of course, settled law that in appropriate circumstances competitive injury constitutes sufficient injury in fact to fulfill Article III requirements.[24] This is acknowledged by the opinion in *Tax Analysts*.[25] In that case appellant Field owns the entire working interest in a Pennsylvania oil well. The well produces three barrels of crude oil per month at a price of $10.28 per barrel. Field's anticipated profits before taxes are approximately $203.76 per year.[26] He complains of economic injury because allegedly illegal IRS rulings have decreased the value of his well and the price he receives for his crude oil.

At first blush it is tempting to hold such economic injury, if it exists, to be *de minimis*. However, it is apparent that there can be no principled justification for such a holding, and the Supreme Court has held that any identifiable trifle of harm is enough to establish standing. *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). It is also tempting to hold that Field's injury is too speculative. While it is true that we cannot know with absolute certainty whether the elimination of the allegedly illegal IRS ruling would redress Field's competitive injury, he has set forth a cogent economic analysis that this would be the case. To require Field to allege facts that would prove the laws of economics would be ungainly, wasteful, and inconsistent with the philosophy of pleading of the Federal Rules of Civil Procedure. The modern conception of "notice pleading"[27] does "not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Requiring Field to allege all of the facts supportive of the chain of causation upon which his allegation of injury rests would return us to the unpredictable and fact-laden system of code pleading.[28]

Recognizing all this, the majority in *Tax Analysts* holds that Field "has suffered injury in fact in his capacity as a competitor."[29] I concur in this holding. And, so far as I can see, the competitive injury that ASTA and the other appellants in *Travel Agents* claim to have suffered is virtually indistinguishable. Yet the majority in that case holds that appellants have no standing because they have failed to demonstrate "any judicially cognizable 'injury in fact.'"[30]

The majority in *Travel Agents* holds, first, that the very existence of appellants' competitive injury is "too speculative to support standing" since they do not allege specific customers who would be gained if the AJC and similar organizations were to lose their tax-exempt status.[31] Second, the majority concludes that "[a]ppellants have not demonstrated that they would reap any

---

**24.** *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 223, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Sierra Club v. Morton,* 405 U.S. 727, 736–37 & n. 11, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Investment Co. Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

**25.** Maj. op. at —— of 184 U.S.App.D.C., at 138 of 566 F.2d.

**26.** 390 F.Supp. at 929.

**27.** Wright and Miller object to the term "notice pleading" and suggest instead "modern pleading" or "simplified pleading." Wright & Miller, Federal Practice and Procedure: Civil § 1202 (1969).

**28.** *See id.:* 2A Moore's Federal Practice ¶¶ 8.12–8.13 (1975); Clark, Code Pleading § 38 (1947); Skinner, *Pre-Trial and Discovery Under the Alabama Rules of Civil Procedure,* 9 Ala.L. Rev. 202, 203–05 (1957).

**29.** Maj. op. at —— of 184 U.S.App.D.C., at 138 of 566 F.2d. The majority terms the government's arguments to the contrary "frivolous." *Id.* at —— n. 45, 566 F.2d at 138 n. 45.

**30.** Maj. op. at —— of 184 U.S.App.D.C., at 148 of 566 F.2d.

**31.** *Id.* at ——, 566 F.2d at 149.

tangible benefit if the court were to order the relief sought."[32]  If the tax-exempt status of the AJC or other tax-exempt organizations were eliminated, these organizations might still maintain lower prices because of "volunteer labor or the willingness to accept lower profits"; or members of these tax-exempt organizations might still prefer the travel programs of their own organizations even if more. expensive; or such members might simply decide not to travel at all.[33]

With all due respect, such reasoning reveals that it is the majority, not the appellants, who is engaging in speculation. The economic basis of appellants' injury, is straight forward, far more compelling even than that alleged by appellant Field in *Tax Analysts*.  Appellants allege that because of the AJC's

> tax-exempt status and the other privileges which flow from it, such as reduced-rate postage, the [AJC] and others are able to offer lower-cost travel programs than plaintiffs and other tax-paying travel agents.  Plaintiffs allege and believe that numerous persons who would otherwise use plaintiffs' services and the services of other tax-paying travel agents are

instead induced by the extensive mail solicitations and lower costs and take business to tax-exempt organizations.[34]

It is true, of course, that all claims of competitive injury are to some extent speculative, since they are predicated on the independent decisions of third parties; *i.e.,* customers.  However, economics is the science of predicting these economic decisions, and it is the stuff of the most elementary economic texts that if two firms are offering a similar product for different prices, the firm offering the lower price will draw away customers from its competitor.  For us to fly in the face of this learning and require a plaintiff to *allege in his complaint* the names of specific customers who would be led to alter their consumption patterns, would be to exalt form over substance and to take a long, unfortunate step backwards into what Professor Moore has termed "the morass" of code pleading.[35]  I know of no case, nor has one been cited by the majority, in which such allegations have been adjudged a necessary element in a complaint of competitive injury.[36]

The majority's reasoning, in fact, is flatly contradictory to *Investment Co. Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28

---

**32.**  *Id.* at ——, 566 F.2d at 150.

**33.**  *Id.*

**34.**  Complaint ¶ 24.

**35.**  2A Moore's Federal Practice ¶ 8.13 (1975). Stripped to its essentials, the majority's argument is that appellants have alleged conclusions rather than facts. However, under the philosophy of the Federal Rules, "it is immaterial whether a pleading states 'conclusions' or 'facts' as long as fair notice is given  .  .  .." *Id.*

**36.**  *See Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940); *Rental Housing Ass'n of Greater Lynn, Inc. v. Hills,* 548 F.2d 388 (1st Cir. 1977); *Concerned Residents of Buck Hill Falls v. Grant,* 537 F.2d 29, 33 (3d Cir. 1976). It is unclear to me exactly what facts the majority would require to be alleged.  Surely an affidavit from a tour package purchaser swearing that *he would have patronized a com-*

*mercial travel agency had its prices been competitive* would constitute the height of speculation.  *See American Trucking Ass'ns, Inc. v. United States,* 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed.2d 1527 (1960), in which the Court concluded that trucking companies had standing under § 205(g) of the Interstate Commerce Act and § 10(a) of the Administrative Procedure Act to challenge the ICC's granting of a permit to a competitor to perform transportation services for appellee General Motors Corporation, *despite GM's statement in court that it would not do business with appellants.*  The Court stated, "And surely the statement by General Motors that it would not in any event give the business to any appellant cannot deprive appellants of standing.  The interests of these independents cannot be placed in the hands of a shipper to do with as it sees fit through predictions as to whom its business will or will not go.  The decision we believe to be controlling is  .  .  .  *Alton R. Co. v. United States,* 315 U.S. 15, [62 S.Ct. 432, 86 L.Ed. 586], where the Court confirmed the standing of a railroad to contest the award of a certificate to a competing trucker."  Id. at 17–18, 80 S.Ct. at 1580.

L.Ed.2d 367 (1971). In that case plaintiffs complained of competitive injury because of an allegedly illegal regulation of the Comptroller of the Currency permitting national banks to establish and operate collective investment funds. The Supreme Court upheld the standing of the plaintiffs, *id.* at 620–21, 91 S.Ct. 1091, even though their allegations of injury were no more specific than those of the appellants in this case. Plaintiffs alleged merely that they would

> suffer present and continuing serious and irreparable injury as a direct result of the illegal activity authorized by the Comptroller's challenged regulations and particularly as a result of the Bank's proposed illegal activity which was approved by the Comptroller under such regulations. This illegal activity will subject the Institute's mutual fund members to illegal competition, will deprive them of legitimate business, and will dilute, divert, and withdraw a substantial portion of the potential market for securities in mutual funds to the substantial and irreparable injury of such plaintiffs and the shareholders in such funds. This illegal activity will also subject the Institute's investment adviser and underwriter members, including the additional plaintiffs, to illegal competition and to loss of opportunities for profit in their

trade and will dilute, divert and withdraw a substantial portion of the potential market for their services to the irreparable injury of such plaintiffs.[37]

The Supreme Court did not, as does the majority in this case, require plaintiffs to allege in their complaint facts sufficient to refute every possible anomaly of the marketplace such as the existence of voluntary labor or ideologically committed consumers. The Court assumed that the marketplace would function in a normal, predictable fashion,[38] for to assume otherwise would be to foreclose the very possibility of ever satisfactorily alleging a competitive injury. As the majority's opinion demonstrates, one might conjecture an indefinite number of such anomalies, some more plausible than others. For every anomaly invented, the plaintiffs' claim can be made to appear more "speculative." Standing under such access rules would virtually depend upon the imagination of the reviewing judge.

The majority argues that its conclusion is required by *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). I disagree. In *Eastern Kentucky,* plaintiffs alleged that a 1969 Revenue Ruling has "encouraged" hospitals to deny services to indigents.[39] Under the tax code, benefactors of institutions

---

**37.** Complaint ¶ 18. *Investment Co. Institute v. Camp* was a consolidation of two cases, No. 61, *Investment Co. Institute v. Camp,* and No. 59, *National Ass'n of Securities Dealers, Inc. v. SEC.* The complaint quoted in text is from No. 61, the case in which the Supreme Court specifically upheld standing.

Just last year, this court accepted jurisdiction of a case in which plaintiffs had obtained standing on the basis of a complaint reading very much like the complaint in the instant case. Plaintiffs alleged competitive injury, yet named no specific customers who had been lost. This court not only accepted plaintiffs' standing, but also upheld the district court injunction because it was necessary to protect these plaintiffs from "further economic and competitive injury." *Independent Bankers Ass'n v. Smith,* 175 U.S.App.D.C. 184, 215, 534 F.2d 921, 952, *cert. denied sub nom. Bloom v. Independent Bankers Ass'n,* 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976); Complaint ¶ 31.

**38.** The assumption is a common one. For example, in cases under the Robinson-Patman

Act, 15 U.S.C. § 13, "competitive injury may be inferred when one set of customers buys at substantially lower prices than other customers." *Hanson v. Pittsburgh Plate Glass Industries, Inc.,* 482 F.2d 220, 227 (5th Cir. 1973), *cert. denied,* 414 U.S. 1136, 94 S.Ct. 80, 38 L.Ed.2d 761 (1974). *See FTC v. Morton Salt Co.,* 334 U.S. 37, 46–47, 68 S.Ct. 822, 828, 92 L.Ed. 1196 (1948): "Here the Commission found what would appear to be obvious, that the competitive opportunities of certain merchants were injured when they had to pay respondent substantially more for their goods than their competitors had to pay." The injury, of course, may be inferred because merchants faced with higher prices and therefore higher costs must in turn charge their customers higher prices and thereby lose business and suffer competitive injury. This is precisely the chain of economic reasoning relied upon by appellants in *Travel Agents.*

**39.** 426 U.S. at 42, 96 S.Ct. 1917.

qualifying as "charitable" under § 501(c)(3) can deduct the amount of their donations. Plaintiffs alleged that the new Revenue Ruling, by permitting hospitals that offered only emergency room services to indigents to qualify for § 501(c)(3) status, "caused" the refusal of various hospitals to admit indigent plaintiffs. The premise of the plaintiffs' argument was that hospitals were so dependent upon deductible donations that they would perform whatever services were necessary to qualify for § 501(c)(3) status. That premise, as a logical or economic prediction, was clearly false: there was no way of knowing in advance whether the increased income from charitable contributions would exceed the increased costs of providing additional services. The result, as the Supreme Court observed, would "vary from hospital to hospital." *Id.* at 43, 96 S.Ct. 1917. Plaintiffs had thus failed to allege facts sufficient to predict whether the change in the Revenue Ruling would affect the behavior of those particular hospitals that had refused to admit the plaintiffs.

*Eastern Kentucky* applies to fundamentally different circumstances than those presented in *Travel Agents.* The injury alleged by ASTA and the other appellant travel agencies does not depend upon the discreet decisions of particular institutions or specific customers. Appellants allege a competitive injury, stemming from a systematic distortion of the marketplace. They claim that, because of illegal IRS rulings, their competitors pay no taxes and therefore have lower costs and charge lower prices. There is nothing hypothetical about this allegation: if we grant the relief appellants seek, the costs of their competitors would necessarily increase. The ultimate injury alleged is a loss of customers, and there is, of course, an implicit prediction in appellants' case that customers will, on the whole, tend to buy similar items at the lowest possible price. The majority can refer to this injury as "abstract" and to this prediction as "speculative," but these are abstractions and speculations that every businessman must confront every day.[40] The majority's corrosive skepticism would altogether eliminate competitive injury as a grounds for standing.[41] That would in fact be contrary to the teaching of *Eastern Kentucky,* since the decision explicitly reaf-

---

**40.** Article III, of course, does not require *absolute certainty* that prospective relief will redress the alleged harm. *See Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 44–45, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *City of Hartford v. Towns of Glastonbury, West Hartford, and East Hartford,* Nos. 76–6049, –6050, –6059, 561 F.2d at 1032 (2d Cir. 1976). This court, for example, has held that an unsuccessful bidder for a government contract has standing to challenge the validity of the awarding of the contract, even though the plaintiff has "no right . . . *to have the contract awarded to it* in the event the district court finds illegality in the award . . . ." (Emphasis added.) *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 376, 424 F.2d 859, 864 (1970). *See Cincinnati Electronics Corp. v. Kleppe,* 509 F.2d 1080 (6th Cir. 1975); *Hayes International Corp. v. McLucas,* 509 F.2d 247 (5th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975); *William F. Wilke, Inc. v. Department of Army,* 485 F.2d 180 (4th Cir. 1973); *Merriam v. Kunzig,* 476 F.2d 1233 (3d Cir.), *cert. denied sub nom. Gateway Center Corp. v. Merriam,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973).

**41.** I share, of course, the majority's concern "to follow as faithfully as possible" *Eastern Kentucky.* Maj. op. at —— n. 7 of 184 U.S.App. D.C., at 151 n. 7 of 566 F.2d. We differ in our reading of that case, not in our respect for the precedents of the Supreme Court. The majority seems to have taken from *Eastern Kentucky* the concepts of "causation," "redressability," and "speculation," without, in my view, adequate appreciation of the malleableness—not to say vagueness—of these ideas. They are the kind of standards that acquire meaningful content only in application to particular circumstances. *See* Tushnet, *The New Law of Standing: A Plea for Abandonment,* 62 Cornell L.Rev. 663, 681–88 (1977). The claim of competitive injury was not addressed in *Eastern Kentucky,* and the majority's result is therefore not required by that case. If this area of the law, confused because "undergoing development," maj. op. at ——, —— n. 7 of 184 U.S. App.D.C., at 151 n. 7 of 566 F.2d, is to be clarified, it will not be through the abstract application of general principles, but through a detailed discussion of the pertinent differences and similarities. I cannot believe that this is an inappropriate function for "an intermediate appellate court." *Id.*

firmed *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Standing was appropriate in *Data Processing,* the Court said, because in that case the complaint had "alleged injury that was directly traceable to the action of the defendant federal official, for it complained of injurious competition that would have been illegal without that action." 426 U.S. at 45 n. 25, 96 S.Ct. at 1927.

In *Travel Agents* appellants also allege "injurious competition" that is "directly traceable to the action of the defendant federal official." The majority attempts to distinguish *Data Processing* by arguing that the relief requested in that case was the total elimination of the allegedly illegal competition, whereas in *Travel Agents* "the AJC and other such groups will clearly remain free to pursue their travel businesses, however the tax status is finally resolved." [42] This distinction, however, goes only to the extent of the injury suffered, not to its speculative or hypothetical nature. And so long as appellants have alleged any "identifiable trifle" of an injury, they should be granted standing. *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Tax Analysts and Advocates v. Blumenthal,* No. 75–1304, 184 U.S.App.D.C. —— at ——, 566 F.2d 130 at 138 (1977). Because I believe that *Data Processing* controls this

case, I would hold that appellants have alleged injury in fact sufficient to meet the prerequisites of Article III.

## II. ZONE OF INTERESTS

*Data Processing* announced two tests for standing: A petitioner must allege injury in fact, and he must allege that the "interest sought to be protected . . . is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830. The majority in *Tax Analysts,* following a different approach from that in *Travel Agents,* finds that appellant Field has suffered injury in fact, but concludes that he must fail the zone test because he is not arguably within the zone of interests protected or regulated by the provisions of IRS § 901(b),[43] the foreign tax credit.

As the majority in *Tax Analysts* candidly admits,[44] the ambiguities and analytic deficiencies of the zone test have in recent years suffered scathing criticism.[45] In order to reach its conclusion, the majority is forced to undertake an extensive reevaluation of the purposes and operation of the zone test. In my opinion not only does the majority reach an incorrect conclusion in the instant case, but its analysis only further confuses an already unfortunately unsettled area of the law.

42. Maj. op. at —— of 184 U.S.App.D.C., at 151 of 566 F.2d. The majority offers two additional reasons for distinguishing *Data Processing.* The first is that the case did "not clearly define the contours of competitor standing as conceived by the Supreme Court." The majority states, for example, that it is unclear whether "a successful claim of competitor standing necessitates naming one or more specific competitors as party opponents." *Id.* at —— n. 5, 566 F.2d at 151 n. 5. But surely this doubt should be laid to rest by the complaint in case No. 61 of *Investment Co. Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), see note 37 *supra,* in which, as in the instant case, only the relevant federal official was made a party opponent and no competitors were named defendants.

The majority also attempts to distinguish *Data Processing* on the grounds that it "was

not a tax case." Maj. op. at —— of 184 U.S. App.D.C., at 151 of 566 F.2d. While I believe this rather cryptic distinction goes to the heart of the majority's holding, it cannot without further elaboration be the basis of a principled distinction. What is needed is a full discussion of the difference between challenges of the rulings of the IRS and challenges of the rulings of other administrative agencies.

43. *See* note 11 *supra.*

44. Maj. op. at —— of 184 U.S.App.D.C., at 138 of 566 F.2d.

45. *See, e.g.,* K. C. Davis, Administrative Law Treatise (Supp.1970) § 22.00–3; Scott, *Standing in the Supreme Court—A Functional Analysis,* 86 Harv.L.Rev. 645, 664 n. 88 (1973).

## A. *Defining the Zone of Interests*

The majority begins with the premise that the zone test must be "based on discerned Congressional purpose."[46] It concludes that the function of the zone test is to allow "courts to define those instances when it believes the exercise of its power at the instigation of a particular party is not congruent with the mandate of the legislative branch in a particular subject area."[47]

I agree with the majority's premise. The real question, however, is how "the mandate of the legislative branch" is to be determined. In some cases congressional intent will be manifest. In *Travel Agents,* for example, the legislative history of sections 511–513 of the Code[48] clearly indicates that Congress intended to eliminate the unfair competition that results when tax-exempt organizations compete with tax-paying enterprises. Both House and Senate Committee reports state that "[t]he problem at which the tax on unrelated business income is directed is primarily unfair competition." H.R.Rep.No. 2319, 81st Cong., 2d Sess. 36 (1950); S.Rep.No. 2375, 81st Cong., 2d Sess. 28 (1950), U.S.Code Cong.Serv. 1950, pp. 3053, 3081.[49] There is no doubt, therefore, that appellants would have satisfied the zone test.

In other cases, however, the legislative mandate will be silent or ambiguous with respect to the interests of a "particular party." In such cases it is necessary to develop rules for the constructive interpretation of congressional purpose. Decisions of the Supreme Court that have enunciated and applied the zone test are the most authoritative source of such rules. These decisions indicate that congressional intent must be construed to include within the zone of interests to be protected or regulated by a statute those interests upon which the statute will have a readily foreseeable impact.

In *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970), for example, plaintiff travel agents challenged as contrary to the Bank Service Corporation Act a ruling of the Comptroller of the Currency authorizing national banks to provide travel services for their customers. Plaintiffs themselves were clearly not the intended beneficiaries of the Act. There were unchallenged findings in the court below that the limitations on banking activity imposed by the Act "were for the purpose of insuring the stability, liquidity, and safety of the banks" and that Congress was unconcerned "with competitors in the businesses impliedly prohibited, much less in any particularity with travel agents". 408 F.2d 1147, 1151 (1st Cir. 1969). Nevertheless the Supreme Court concluded that the interests asserted by plaintiffs were arguably within the zone of interests protected by the Act. The *only* connection between plaintiffs' interests and the Act was that "[w]hen national banks begin to provide travel services for their customers, they compete with travel agents . . . ." 400 U.S. at 46, 91 S.Ct. at 159.

*Investment Co. Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), teaches a similar lesson. In that case plaintiff investment companies challenged a regulation of the Comptroller authorizing national banks to establish and operate collective investment funds. Plaintiffs alleged that the regulation violated provisions of the Glass-Steagall Banking Act. Despite unchallenged evidence that "neither the language of the pertinent provisions of the Glass-Steagall Act nor the legislative history evinces any congressional concern for the interests of petitioners and

---

**46.** Maj. op. at —— of 184 U.S.App.D.C., at 140 of 566 F.2d.

**47.** *Id.* at ——, 566 F.2d at 140.

**48.** *See* notes 5 and 8 *supra.*

**49.** Treasury regulations recognize that the primary purpose of the unrelated business income tax "was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the non-exempt business

others like them in freedom from competition," 401 U.S. at 640, 91 S.Ct. at 1103 (Harlan, J., dissenting),[50] the court held that plaintiffs satisfied the requirements of the zone test. Again, the readily foreseeable impact of the statute on plaintiffs' interests was their only connection to the legislation.

These decisions, then, stand for the proposition that, in the absence of manifest congressional intent to the contrary, the zone of interests arguably protected or regulated by a statute should at a minimum include those interests upon which the statute has a readily foreseeable impact.[51] Plaintiffs asserting such interests should have standing under the zone test.

The majority, however, rejects this conclusion, arguing that "the concepts of *consequence* and *impact* are not the proper guideposts to define the relevant zone of interests."[52] The majority reasons that defining "the zone of interests as being the equivalent in every case of the 'zone of impact' or the 'zone of consequences.' . . would establish a standing doctrine based solely on the existence of harm to a party . . . ."[53] But this reasoning is clearly faulty: a statute's zone of *foreseeable* impact or consequences would not encompass every incidence of *actual* impact. And, more importantly, the majority's conclusion

is flatly contradictory to the guidance of the Supreme Court.

I sense yet another, implicit reason underlying the majority's rejection of the liberal standards of *Arnold Tours* and *Investment Co. Institute.* Although the majority acknowledges that the zone test is meant to be "a quite generous standard,"[54] it nevertheless argues that the test implements that aspect of standing doctrine designed to define "the proper—and properly limited—role of the courts in a democratic society."[55] This function of standing law, however, has been used to justify the *restriction* of access to federal courts.

Even if the majority has correctly identified the appropriate function of the zone test, it does not follow that the test must be interpreted in a restrictive fashion. The Supreme Court decisions that have used standing doctrine to define the role of the courts in a democracy have been in the context of constitutional challenges to government action.[56] Such challenges raise difficult issues about the proper judicial role because they require a non-elected judiciary on its own authority to pass on the actions of the democratic branches of government. These issues are not raised in so dramatic a fashion by the zone test, however, at least in its statutory application.[57] In that context courts are asked only to measure the authority of executive

---

endeavors with which they compete . . . ." 26 C.F.R. § 1.513–1(b).

**50.** The Court even appeared to concede this point. 401 U.S. at 634, 91 S.Ct. 1091. *See* Scott, *supra* note 45, at 665–66.

**51.** This formulation is consistent with the only case I have found to give extensive consideration to this question, *Cotovsky-Kaplan Physical Therapy Ass'n, Ltd. v. United States*, 507 F.2d 1363, 1366–67 (7th Cir. 1975) (per Stevens, J.).

**52.** Maj. op. at —— of 184 U.S.App.D.C., at 144 of 566 F.2d.

**53.** *Id.* at ——, 566 F.2d at 144.

**54.** *Id.* at ——, 566 F.2d at 140.

**55.** *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

**56.** *E. g., id., United States v. Richardson*, 418 U.S. 166, 188, 94 S.Ct. 2940, 41 L.Ed.2d 678

(1974) (Powell, J., concurring); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 221–23, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Frothingham v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). *But see Flast v. Cohen*, 392 U.S. 83, 100, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968): "The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government."

**57.** And the majority chooses to discuss the zone test only in its statutory application. Maj. op. at —— of 184 U.S.App.D.C., at 139–140 of 566 F.2d. For an example of the use of the zone test in the context of a constitutional challenge to a state statute, *see Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 97 S.Ct. 599, 602 n. 3, 50 L.Ed.2d 514 (1977).

action under applicable statutes.[58] Such suits represent routine, accepted and legitimate exercises of judicial power,[59] so much so that the Supreme Court has repeatedly held that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).[60] Standing doctrine and reviewability doctrine raise identical issues about the nature of the judicial role in the context of statutory review of executive action. The unproblematic nature of that role is reflected in the generosity of the *Abbott Laboratories'* standard of reviewability, and it should be reflected in an equally generous standard for standing, assuming, of course, that the injury in fact requirement of Article III has been met. And this, I take it, is the underlying significance of the very liberal standards of *Arnold Tours* and *Investment Co. Institute.*[61]

### B. Technique in the Application of the Zone Test

The majority devotes much of its opinion to a discussion of "the proper technique to employ in order to discern the Congressional intention in a manner which does not defeat other basic tenets of the law of standing." [62] The majority first concludes that congressional intent must be determined from the specific applicable statutory provision and not from the statute as a whole. It offers two reasons for this prescription: such a specific focus will ensure "complete adversariness," and it will reduce the possibilities of endless litigation that would "distort the role of the courts in relation to the legislative branch".[63]

I have difficulty following the majority's reasoning. If the basis of the zone test is the discernment of congressional purpose, a court should use whatever material is relevant to that inquiry. As Chief Justice Marshall advised a very long time ago, "[w]here the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived . . . ." *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805). A traditional canon of statutory interpretation is that laws are to be read as a harmonious whole.[64] "It is undoubtedly a well-established principle in the exposition of statutes, that every part is to be considered, and the intention of the legislature to be extracted from the whole."

---

**58.** *Investment Co. Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

**59.** *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3531, at 39 (Supp.1977).

**60.** *See, e. g., Dunlop v. Bachowski,* 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Barlow v. Collins,* 397 U.S. 159, 166–67, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). This court has noted that there is a "general rule that official administrative action is reviewable in courts when a person claims injury from an act taken by a government official in excess of his powers." *Curran v. Laird,* 136 U.S.App.D.C. 280, 286, 420 F.2d 122, 128, (1969) (en banc). *See Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 386, 424 F.2d 859, 874 (1970).

**61.** There are very few decisions that find injury in fact but, that deny standing on the basis of the zone test. K. C. Davis, Administrative Law of the Seventies § 22.02–11, at 510 (1976). *See*

*Gifford-Hill & Co., Inc. v. FTC,* 173 U.S.App. D.C. 135, 523 F.2d 730 (1975); *Clinton Community Hospital Corp. v. Southern Maryland Medical Center,* 510 F.2d 1037 (4th Cir.), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); *Higginbotham v. Barrett,* 473 F.2d 745 (5th Cir. 1973); *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971).

**62.** Maj. op. at —— of 184 U.S.App.D.C., at 140 of 566 F.2d.

**63.** *Id.* at ——, ——, 566 F.2d at 141.

**64.** "We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, 'we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy.'" *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492 (1962). "Emphasis should be laid . . . upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts."

*Id.* Contradictory interpretations of differing statutory sections are avoided on the assumption that statutes constitute the expression of a coherent purpose, not a patchwork of conflicting intentions.[65] Thus consideration of an entire statute is often considered necessary to an informed interpretation of any of its particular sections. And this procedure, not surprisingly, has been a standard technique among courts applying the zone test.[66]

The majority's reasons for abandoning this traditional approach are simply not convincing. The "complete adversariness" that it seeks, aside from being logically unconnected to the question of how many statutory provisions are at issue, is adequately served for the purposes of standing by the injury in fact suffered by the plaintiff. This injury ensures that plaintiffs have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends . . . ." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). And I am even more baffled by the majority's second reason, that focusing on a particular statutory section will create the possibility of endless litigation that "would distort the role of the courts in relation to the legislative branch". Examination of a particular provision in the context of an entire statute will increase the accuracy of judicial discernment of congressional purpose. And I cannot comprehend how accurately ascertaining congressional purpose can possibly distort the role of the courts with respect to Congress. Surely, the majority does not mean to argue that the possibility of increased litigation, by itself would constitute such a distortion.

Perhaps as an illustration of its analysis, the majority blends into its theoretical reasoning a specific discussion of the Internal Revenue Code. The Code, it notes, "does *not* have a single, unified purpose", and, therefore, litigants should not be permitted to borrow "the arguable regulatory or protective intent embodied in one provision of the Code, and apply it to a provision where that intent is not evident . . . ."[67]

United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940). *See Philbrook v. Glodgett,* 421 U.S. 707, 713–14, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975); *Weinberger v. Hynson, Wescott & Dunning, Inc.,* 412 U.S. 609, 631–32, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *United States v. Alpers,* 338 U.S. 680, 684, 70 S.Ct. 352, 94 L.Ed. 457 (1950); *Markham v. Cabell,* 326 U.S. 404, 411, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

65. *N L R B v. Lion Oil Co.,* 352 U.S. 282, 288, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957); *F P C v. Panhandle Eastern Pipeline Co.,* 337 U.S. 498, 514, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949); *Clark v. Uebersee Finanz-Korporation,* 332 U.S. 480, 488, 68 S.Ct. 174, 92 L.Ed. 88 (1947).

66. *See, e. g., Ellis v. Department of Housing and Urban Development,* 551 F.2d 13, 16 (3d Cir. 1977); *City of Hartford v. Towns of Glastonbury, West Hartford, and East Hartford,* Nos. 76–6049, –6050, –6059, 561 F.2d at 1040 (2d Cir. 1976); *Concerned Residents of Buck Hill Falls v. Grant,* 537 F.2d 29, 33–34 (3d Cir. 1976); *Cincinnati Electronics Corp. v. Kleppe,* 509 F.2d 1080, 1086 (6th Cir. 1975); *Thompson v. Washington,* 497 F.2d 626, 632, 162 U.S.App. D.C. 39, 45 (1973); *Davis v. Romney,* 490 F.2d 1360, 1365 & n. 3 (3d Cir. 1974); *Constructores Civiles de Centroamerica v. Hannah,* 148 U.S. App.D.C. 159, 164–65, 459 F.2d 1183, 1188–89 (1972); *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 691 (2d Cir.), cert. denied, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971).

The majority's attempt to distinguish *Constructores Civiles,* maj. op. at ——–— of 184 U.S.App.D.C., at 141–142 of 566 of F.2d, simply will not wash. The majority states that "[i]n *Constructores* it was acceptable to examine both particular and general provisions because those provisions shared an identity of purpose." Whether two provisions of a statute share a common purpose is a conclusion that can only be reached *after both provisions have been examined.* It therefore cannot function as a criterion of whether to examine both provisions in the first place. Driven by the illogic of their position, the majority ultimately concedes that in *Constructores* "it was necessary to examine the general language of the preamble to ensure that a grant of standing would not be inconsistent with the statutory purpose." But this reason, of course, would justify examining the general provisions of a statute *in every case.*

67. Maj. op. at —— of 184 U.S.App.D.C., at 141 of 566 F.2d.

As a conclusion this observation is unimpeachable, but it begs the real question. Even assuming, arguendo, that the relevant zone of interests emanates only from a particular provision of the Code rather than from the Code as a whole, the question of whether one provision of the Code is relevant to the interpretation of another can only be answered *after both provisions have been examined.* It is not a question that can be addressed in the abstract. Yet this is just what the majority opinion, drawing on its theoretical analysis, purports to do. *A fortiori* the majority completely misses the thrust of appellant Field's argument that, although various sections of the Code have different goals, the *entire* Code is infused with certain general purposes.[68] These general purposes, he claims, arguably *give rise to a zone of protected interests that emanates from the Code as a whole.* The majority rejects this argument on the grounds of nothing more convincing than bald assertion.

The majority reaches a second major conclusion concerning proper technique in the application of the zone test: the examination of legislative history is to be avoided and the appropriate zone determined from "the face of the statute."[69] The majority is aware that courts regularly resort to legislative history in order to discern the intent of Congress. It shows less awareness that courts also regularly use legislative history for the same purpose in the application of the zone test.[70] The majority argues, however, that there are three special reasons why this latter practice should cease. First, the examination of legislative history will lead to a prejudgment of the merits of the case. Second, it is likely to be unilluminating; and third, it will undermine the generous nature of the zone test.

Taking these reasons in order, there is, first, no logical connection between the use of legislative history and a prejudgment of the merits of the case.[71] The majority thus seems to be making a psychological point: "A canvassing of the entire legislative background may lead to a decision on the question of standing based on an assessment of the strength or weakness of the claims being presented."[72] The majority's assumption appears to be that federal judges will not be able to keep distinct issues of standing and of the merits when confronted with information relevant to both. I reject this assumption as completely unfounded. We trust federal judges to successfully perform such tasks all the time, as for example when ruling on the admissibility of evidence in non-jury trials. Standing and the merits require distinct inquiries,

---

**68.** Appellant refers to the General Statement of H.R.Rep.No. 1337, 83d Cong., 2d Sess. 1 (1954), U.S.Code Cong. & Admin.News 1954, p. 4025, that accompanied the enactment of the Internal Revenue Code of 1954: "In general, the purpose of these changes has been to remove inequities, to end harassment of the taxpayer and to reduce tax barriers to future expansion of production and employment."

**69.** Maj. op. at —— of 184 U.S.App.D.C., at 142 of 566 F.2d. It would be well to remember the counsel of Justice Reed: "When aid to construction of the meaning of words, as used in [a] statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" *United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940).

**70.** *See, e. g., Safir v. Kreps,* 551 F.2d 447, 451 (D.C.Cir.1977), *petition for cert. filed,* 46 U.S. L.W. 3013 (U.S. July 11, 1977) (No. 77–65);

*Rental Housing Ass'n of Greater Lynn, Inc. v. Hills,* 548 F.2d 388, 390 (1st Cir. 1977); *Hayes International Corp. v. McLucas,* 509 F.2d 247, 256 (5th Cir.), *cert. denied,* 432 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975); *Pesikoff v. Secretary of Labor,* 163 U.S.App.D.C. 197, 200, 501 F.2d 757, 760 n. 2, *cert. denied,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974); *Secretary of Labor v. Farino,* 490 F.2d 885, 889 (7th Cir. 1973); *Higgenbotham v. Barrett,* 473 F.2d 745, 749 (5th Cir. 1973); *City of Inglewood v. City of Los Angeles,* 451 F.2d 948, 955 (9th Cir. 1971); *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 691 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971).

**71.** I agree with the majority, however, that standing and the merits are, and should remain, distinct issues.

**72.** Maj. op. at —— of 184 U.S.App.D.C., at 141–142 of 566 F.2d.

and federal judges are perfectly capable of using legislative history to answer the demands of each.

Second, legislative history may indeed be "unilluminating," but it also may be helpful, and there is no way of knowing until one looks. Legislative history can be and often is an important instrument in the determination of congressional intent.[73] The majority's proscription of legislative history in all cases simply because of its failure in some, reminds me of the gourmet who, having once tasted sour grapes, refused to eat anything.

Finally, there is simply no way to predict whether the resort to legislative history will expand or contract the generosity of the zone test.[74] The results will vary from case to case. What is clear, however, is that if the determination of congressional intent is relevant, the use of legislative history may lead to more *accurate* applications of the test. The generosity of the test will be sufficiently protected by the legal standard that resolves in plaintiff's favor all "potential ambiguities in the legislative history" and in the face of the statute.[75]

C. *The Application of the Zone Test to Appellant Field*

The majority is aware of "the confusion surrounding the meaning of which interests are relevant to the zone test," and it concludes that what must "fall within the relevant zone" is "the particular interest the parties are asserting in the litigation."[76] Yet the majority denies Field standing because "the protective intent of the statutory section extends to all those U.S. compa-

nies doing business abroad and paying foreign income taxes" and "appellant Field cannot be said to fall within the regulatory field of concern".[77] *Therefore*, the majority argues, Field's interests cannot arguably have been intended to have been protected by § 901(b). In other words, contrary to its own advice, the majority acts as if the zone test requires the *plaintiff himself* to be within the statutory zone.

The majority's conclusion that a plaintiff's interests must fall within the relevant zone, however, is correct. *Arnold Tours* and *Investment Co. Institute* make clear that a plaintiff will satisfy the zone test if he asserts interests upon which the applicable statute will have a readily foreseeable impact.

Using this framework of analysis, the interests Field asserts are arguably within the zone of interests to be protected by § 901(b). A primary purpose of that section, as the majority clearly establishes, is to prevent the double taxation of United States corporations operating abroad. But this purpose is itself founded on the deeper principle that, as one noted scholar of the foreign tax credit has put it, "taxpayers with an equal taxable capacity should bear an equal United States tax burden. . . [T]he result of the operation of the credit is that United States corporations . . . with the same amount of income bear an equal total tax burden on income whether or not they are subject to foreign income taxation."[78] The section thus establishes an equation of rough equality between United States corporations that must pay certain foreign taxes and those that have tax liability only to the United States

---

**73.** *E. g., Harrison v. Northern Trust Co.*, 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407 (1943); *Commissioner of Internal Revenue v. Estate of Church*, 335 U.S. 632, 687, 69 S.Ct. 322, 93 L.Ed. 288 (1949) (Frankfurther, J., dissenting, Appendix A).

**74.** There is something deeply ironic in the majority's justifying its exorcism of legislative history on the grounds of defending the generosity of the zone test at the very same time as it deafens itself to appellant's arguments that, on

the basis of legislative history, he is arguably within the zone of interests to be protected. *See* note 68 *supra*.

**75.** Maj. op. at —— of 184 U.S.App.D.C. at 142 of 566 F.2d.

**76.** *Id.* at —— n. 76, 566 F.2d at 142 n. 76.

**77.** *Id.* at ——, 566 F.2d at 143.

**78.** E. Owens, The Foreign Tax Credit 3 (1961).

government. If the IRS were mistakenly to deny a valid application for a foreign tax credit, one side of this equation would be violated. Similarly, if the IRS were mistakenly to grant a foreign tax credit, the equation would be violated on the other side. This is essentially Field's position. He claims that his interests in tax parity with his competitors who import foreign oil are implicit in the structure of § 901(b) and that his interests are therefore arguably within the zone of interests to be protected by the section.

The legislative history of § 901(b) is silent about congressional concern for those in Field's circumstances. The readily foreseeable consequences of the foreign tax credit on Field's competitive situation, however, is powerful support for his claim. His position is indistinguishable from that of the plaintiff travel agents in *Arnold Tours* or that of the plaintiff investment companies in *Investment Co. Institute*. I would therefore grant standing to appellant Field.